## EARP v. MID-CONTINENT PETROLEUM CORP. et al.

No. 21245. Opinion Filed June 27, 1933.

Rehearing Denied Dec. 19, 1933.

West, Gibson, Sherman, Davidson & Hull, for plaintiff in error.

Blakeney & Ambrister, for defendants in error.

BUSBY, J. This action was commenced in the district court of Lincoln county in March of 1929, by Claude Russell Earp as the owner of an undivided interest in certain lands situated in that county. He sought to quiet his title to such lands against a recorded and unreleased oil and gas lease executed in favor of John Wagner. He also prayed for an accounting for a portion of

the profits derived from oil and gas produced upon said premises by the Mid-Continent Petroleum Corporation.

The cause was tried to the court November 11, 1929. The judgment rendered was adverse to the plaintiff Earp, and he has perfected his appeal to this court. For convenience, the parties will be referred to herein as plaintiff and defendants, respectively, as they appeared in the trial court.

In November, 1924, the plaintiff, Claude Russell Earp, was the owner in fee of an undivided 2/33 interest in the N. E. 1-4 of sec. 8, twp. 15, north, range 6 E, situated in Lincoln county, Okla. The remaining 31/33 interest was owned by Mary F. Earp and others. (It is unnecessary to burden this opinion with the names of all of the co-owners.) These parties were tenants in common of the property above described.

On November 10, 1924, Mary F. Earp and all the others owning interests in the property with the exception of the plaintiff, Claude Russell Earp, joined in the execution of an oil and gas lease to the Cosden Oil & Gas Company, which lease purported to lease all of the premises above described for oil and gas purposes. This lease was subsequently assigned to the defendant Mid-Continent Petroleum Corporation, and the Cosden Oil & Gas Company passed out of the picture with the assignment. The Mid-Continent Petroleum Corporation recognizes that the lessors in the lease owned only 31/33 of the premises at the time of its execution, and that it did not operate as a lease upon the 2/33 interest owned by the plaintiff.

On the 19th day of November, 1924, Mary F. Earp, acting as guardian of the plaintiff, who was then a minor, executed to the defendant John Wagner an oil and gas lease on the 2/33 interest in the land previously described. The validity of the lease at the time of its execution is not questioned in this appeal. The lease was a common commercial form of "unless lease" for a term of five years and as long thereafter as oil and gas or either of them should be produced from said land by the lessee. The lease was sold to John Wagner for a cash consideration of $2,700 and contained the usual provision for one-eighth of 2/33 of the oil and gas produced as royalty.

The plaintiff attained his majority November 30, 1925, and thereafter conveyed by mineral deed an undivided 1/40 interest in and to the oil and gas rights under said land to Fred Sowards and William J. Sowards, who are defendants and cross-petitioners in this action. He also conveyed an undivided 1/160 interest in the oil and gas rights under said land to Thomas M. Luper, which was subsequently conveyed to T. H. Greer, as trustee for Petroleum Royalties Corporation, who was one of the defendants and cross-petitioners in this action. These parties will be referred to as the grantees of the plaintiff.

The defendant John Wagner executed an assignment of a one-sixth interest in his lease to T. C. Ross, another assignment of a one-sixth interest to Roy Dawson and another one-sixth interest to E. C. Love, all of whom are defendants in this action and who will be referred to as associates of John Wagner.

In the summer of 1925, oil and gas in paying quantities was discovered on premises adjoining the land concerned in this controversy in such close proximity to the boundaries as to require the drilling of offsets upon the premises in which the parties in this controversy were interested. The Mid-Continent Petroleum Corporation, in July of 1925, entered upon the premises and commenced drilling an offset well in which oil was discovered. This company thereafter drilled a number of other wells from which oil and gas was produced in paying quantities. The extent to which John Wagner and his associates participated or acquiesced in these drilling operations will be more fully discussed hereafter. Wagner and his associates paid delay rental under their lease one year, thereby extending the time to drill until November of 1926, but since that time have neither paid delay rentals nor drilled unless they may in some way be considered to have acted through the Mid-Continent Petroleum Corporation in its drilling operations.

Royalty payments representing a portion of the proceeds of oil produced from the premises were paid by the Mid-Continent Petroleum Corporation to the plaintiff Earp, and received by him in March, 1926, and thereafter as production continued.

It appears that on the 1st day of April, 1927, John Wagner and associates commenced an action in the district court of Lincoln county against the Mid-Continent Petroleum Corporation and others who were agents and servants of the Mid-Continent Petroleum Corporation, seeking to recover damages in the sum of $150,000, on the theory that the entry of the Mid-Continent Petroleum Corporation upon the premises involved was a malicious and willful tres-

pass as far as Wagner and associates were concerned, and that the drilling operations of that corporation were without the consent of and forbidden by Wagner and his associates. In a second cause of action in the same case, plaintiff sought punitive damages by reason of the filing of a certain notice of lien claim in the office of the county clerk of Lincoln county. This action was numbered 9356 in the Lincoln county district court, and is now pending in this court as cause No. 21946, this day decided (Moody v. Wagner, 167 Okla. 99, 23 P. (2d) 633). The extent of the liability of the Mid-Continent Petroleum Corporation is therein determined in so far as the same is not adjudicated herein.

Other facts material to a determination of the issues in this cause will be set out in the subsequent portions of this opinion.

At the time of the trial the parties to the controversy may be classified into four groups: First, Mary F. Earp and others, the lessors of 31/33 interest to the Mid-Continent Petroleum Corporation. The right of this group to receive 1/8 of 31/33 of all oil produced is not controverted by any of the parties. Second, the Mid-Continent Petroleum Corporation, which admits its liability to some one to account for 2/33 of the net profits derived from the oil and gas produced from the property concerned herein. Third, the plaintiff, Claude Russell Earp, and his grantees, who claim that they are entitled to 2/33 of the net profits derived from the drilling operations and production to the exclusion of Wagner and his associates on two theories: (a) That the lease of Wagner and his associates expired in November of 1926, by the failure on the part of the lessees to pay delay rentals or drill; (b) that, assuming the lease of Wagner to be in full force and effect, there had been no drilling or entry thereunder, and Wagner and associates were not cotenants and were not entitled to participate in the proceeds as such. The fourth group is Wagner and his associates, who assert, in substance, that the drilling by the Mid-Continent was in effect their act by reason of their consent given thereto and by virtue of an alleged agreement on their part that deductions might be made from the proceeds of the oil produced to defray a portion of the expense of development and operation; that such drilling being in effect their act, their lease was thereby extended and continues in force during the period of production; that the act of drilling by the Mid-Continent on the premises covered by the leases operates to continue in force their lease, even in the absence of an agreement, and that the plaintiff and his grantees are by their acts and conduct estopped from questioning the existence of their lease or have waived the provisions thereof respecting termination or have ratified the lease by subsequent acts.

The controversy herein centers around the existence of the Wagner lease and the rights thereunder, and especially as limited to the dispute beetween Earp and his grantees and Wagner and his associates.

Before considering the contentions made by the respective parties, we deem it proper to recognize the existence of certain principles of law concerning which there seems to be little or no controversy between the parties, but which are all important as a background for a proper determination of their rights.

Most of the principles of law which are undisputed in this case are recognized or announced in the case of Prairie Oil & Gas Co. v. Allen, 2 F. (2d) 566, 42 A. L. R. 1389 (the case arising in Oklahoma). It is conceded that the owners of undivided portions of oil and gas rights in and under real estate are tenants in common. Each of such cotenants may enter upon the premises for the purpose of exploring for oil and gas, and may drill and develop the premises. However, one cotenant cannot exercise that right to the exclusion of the other, and each may exercise the same right and privilege with reference to the common property. Upon the discovery of oil and gas upon the premises, the producing cotenant must account to the nonconsenting or nonproducing cotenant for his pro rata share of the net profits apportioned according to the fractional interest of such cotenant, the net profits being determined by deducting from the market value of the oil or gas produced, the necessary expense of developing, extracting, and marketing the same. Each of the cotenants may lease his undivided interest in the common property without the consent of the other cotenants, such a lease being effective as to his interest in the property, but ineffective as to the interest belonging to his cotenants. During the period of such a lease, the lessee enjoys the same rights and privileges to enter upon the common premises for the purpose of exploration and development which his lessors had prior to the execution of the lease.

It is also decided in the Prairie Oil & Gas Company Case, supra, that the lessee upon entry becomes a cotenant with the co-

tenants of his lessors, and upon production is liable to account to the nonconsenting or nonparticipating cotenant on the same basis that his lessor would have been compelled to account had the production been accomplished by him. The question of whether or not the lessee becomes a cotenant before entry is disputed in this case and will be more fully considered in the subsequent portions of this opinion. The existence of relationship of cotenants between different owners of undivided interests in property does not create the relationship of principal and agent between them. Howard v. Manning, 79 Okla. 165, 192 P. 358.

Several lessees owning leasehold interest in the same property may properly enter into an agreement to develop the common property. In such a case, a mining partnership is frequently established. Barrett v. Buchanan, 95 Okla. 262, 213 P. 734. There can be no serious question that when lessees holding under different leases from different lessors enter into an agreement to develop the common property, each agreeing to share in the expense of development and operation, the development and production accomplished by them as a result of such agreement among themselves is as much the act of one as it is the act of the other, and the discovery and production of oil operates as a compliance with the provision of the lease of each of the lessees co-operating in the development. Nor do we think that any particular form of agreement is essential to accomplish this result, it being sufficient if the lessee claiming the drilling operation as a compliance with the terms of his lease can rightfully say that the exploration and development of the premises is his act in whole or in part. However, in order to claim the act of drilling as his own, it is obvious that there must be something more than a mere passive acquiescence in the drilling by another lessee under a separate lease. This for the reason that the lessee of one cotenant is bound as a matter of law to acquiesce in such drilling so long as the same is not conducted in such a manner as to exclude him from exercising a similar right in connection with the same premises.

Bearing in mind the foregoing principle, we pass to a consideration of the contention of John Wagner and his associates that there exists in this case such an agreement as would make the drilling conducted by the Mid-Continent Petroleum Corporation the acts of his, Wagner's, and his associates, in whole or in part. The determination of this question being in part a question of fact and this cause being one of equitable cognizance, it is necessary that we review and weigh the evidence, and if, after weighing the same, it is found that the judgment of the trial court is clearly against the weight of the evidence, it is proper to render or cause to be rendered such judgment as the trial court should have rendered.

As stated above, another action involving the same property and a number of the same parties was filed in the district court of Lincoln county approximately two years previous to the time this case was filed. In that case John Wagner and his associates were plaintiffs, and the petition filed by them was introduced in evidence in this case. That petition contained the following statement of facts bearing directly upon the existence or nonexistence of an agreement between the Mid-Continent Petroleum Corporation and Wagner and his associates:

"These plaintiffs allege and show that the defendants and each of them jointly and without color of title, and in violation of plaintiffs' rights, willfully, unlawfully, and maliciously entered on said premises after being expressly forbidden so to do by these plaintiffs herein, who were the owners and in possession of same, and extracted and removed from the leasehold estate belonging to these plaintiffs, a large amount of oil, gas, casinghead gas, casinghead gasoline, and the by-products thereof. These plaintiffs say that they protested to said defendants their entry on said premises and their trespass on said leasehold estate and demanded of them and each of them the oil, gas, casinghead gas, and casinghead gasoline and the by-products thereof produced therefrom, but said defendants and each of them unlawfully, willfully, and maliciously and with the intent and purpose of depriving these plaintiffs herein of their property and in order to deprive them of the use thereof and of the proceeds therefrom, and in order to harass, annoy, provoke, embarrass, and discommode them, and in violation of their rights, refused to deliver to said plaintiffs the oil and gas so taken by them from said leasehold estate and the proceeds thereof, but unlawfully, willfully and maliciously converted and used the same to their own use and benefit. That said defendants are still in possession of said leasehold estate belonging to the plaintiffs and are still unlawfully, willfully, and maliciously taking and extracting from said leasehold estate belonging to these plaintiffs a large amount of oil, gas, casinghead gas and casinghead gasoline and the by-products thereof, which is the property of these plaintiffs, and are still using and converting the use to their

own use and benefit with the intent to deprive these plaintiffs of the value thereof."

It will be seen that John Wagner and his associates in their pleadings in the previous action definitely denied the existence of any contract or agreement between themselves and the Mid-Continent Petroleum Corporation for the purpose of developing the property concerned in this action. In tion, they did not anticipate that the plainment, but that the entry of the Mid-Continent Petroleum Corporation was expressly forbidden by them. It is quite evident that at the time they filed the previous action, they did not anticipate that the plain tiff in this action would bring a suit for the purpose of canceling that lease. In their answer and cross-petition filed in this case, we observe a pronounced change of attitude. In their pleadings, they say:

"These answering defendants further allege that thereafter the Mid-Continent Petroleum Corporation, a co-owner of said property with the said plaintiff, and the owner of a majority interest therein, entered upon the said premises and developed the same within the terms of the said deferred rental, to wit: on or about the 1st day of February, 1928, and produced a large amount of oil therefrom, charging the prorata part of the expenses to these answering defendants, and paying to the said Earp, by remittance to his guardian during his minority, and to the said Earp after he became of age, the royalty for all oil produced in an aggregate of many thousands of dollars, and the same was accepted and received by the said Earp, the plaintiff herein, with full knowledge of the source of the said money, and the reason for paying the same, and that thereby the said lease became and continued a vested interest in the said premises, and in the oil, gas, and other minerals therein, and that these answering defendants are entitled to have their title quieted against any claim of said plaintiff, or any of the codefendants herein."

They also stated in the same pleading:

"These defendants have offered and have always been willing to pay for all development in which oil, gas, or either of them, was discovered or produced in paying quantities."

John Wagner, when called as a witness in behalf of himself and his associates, stated that he had principally managed the affairs of himself and his associates in connection with the lease involved in this action. With reference to the existence of an agreement between the Mid-Continent Petroleum Corporation and himself and his associates concerning the development of the premises, he stated that he had a conversation with one Mr. Scarborough, a representative of the Mid-Continent. The substance of that conversation appears in the following excerpt of his testimony:

"A. I called Mr. Scarborough and tried to sell him my interest. Q. Did you have any talk with him with reference to the expense? A. I did, he told me he was going to go in there and drill those wells the same as if they owned it all, and they would hold my oil to pay the expense of the drilling, and I said 'If you are going to do that, go ahead; I can't stop you. If I know of any way I could, I would'."

He also referred to a letter written by Mr. Scarborough in connection with the conversation and his answer to the same, which letter and answer are as follows:

"July 1st, 1925.
"Mr. John Wagoner,
"Chandler, Oklahoma.
"Dear Sir:

"Confirming our telephone conversation of recent date, wherein you stated you would agree for Cosden Oil & Gas Company to drill the location described as the northwest of the northwest of 8-15-6 which is an offset to Skelly's well located in N. E./4 of N. E./4 of 7, now producing around 1,500 barrels. In this conversation you agreed that you would also pay your pro rata share of this well whether a producer or not and would pay your part of any other well that was drilled on this lease if an offset to a producing well.

"We would thank you very much for a letter, confirming these facts, for our files. We do not intend starting but one well at the present time, but would appreciate a letter from you stating you will pay your part of any other well that the company might start on this lease providing it is an offset to production.

"Yours very truly,
"Cosden Oil & Gas Company,"
"J:S: O. M.        By Land Department,"

"Chandler, Okla.
"July 13, 1925.
"Mid-Continent Petroleum Corporation,
"Tulsa, Okla.
"Gentlemen:        Attention Mr. Scarborough.

"I am just in receipt of your letter of the 1st upon my return from out of the state.

"In some way you misunderstood our conversation over the phone regarding the drilling of the first well on the northwest quarter of the northwest quarter of 8-15-6 as I did not agree to pay my pro rata share of this well if it was not a producer.

"My recollection of this conversation was, that you were going ahead and drill the first well at your own risk and that you had already started same; and that should the first well be a producer that the cost would be chargeable against the lease; and that you would not drill any other well on the lease except those offsetting producing wells."

The witness also said in his testimony:

"Q. You are expecting to have to take up from any amount received for oil the reasonable and proper charges for operation and development. A. Yes, sir. Q. And he didn't have your consent to drill the wells? A. We talked further, and he said, 'all right,' if it was a producing well, but if it was a dry hole, he would have to pay it."

Viewing this testimony in its most favorable light to Wagner and his associates, it is apparent that Wagner did not intend to agree to participate in the drilling operations or share the burden thereof other than to permit the reasonable and proper charge for operation and development to be deducted from such share of the oil as he and his associates might be entitled to. **This deduction and charge would be proper and allowable as a matter of law in the absence of any agreement or willingness on the part of Wagner and his associates. Prairie Oil & Gas Company v. Allen, supra. It was nothing more than a willingness to do what the law required and permitted. In fact, his testimony indicated the only reason he permitted the Mid-Continent to drill and develop was because he could not prevent it.** We must, therefore, hold that the clear weight of evidence in this case supports the view that as between the Mid-Continent Petroleum Corporation and John Wagner and his associates, no agreement to co-operate in the development of the common property existed other than a passive and reluctant acquiescence on the part of Wagner and associates. It follows that the acts of the Mid-Continent in developing the premises concerned in this action were not in any sense of the word the act of Wagner and his associates, and cannot be claimed by them as such.

The fact that Wagner and his associates did not enter upon the premises under their lease for the purpose of drilling is claimed by the plaintiff Earp to be of importance in this case for two reasons: First, that they were not cotenants with the Mid-Continent Petroleum Corporation prior to the entry, and could not participate in the proceeds of the production as such. Second, that a failure to enter and drill or pay rentals terminated their lease. The first claim of the plaintiff is stated in their brief in the following proposition:

"We maintain as an indisputable proposition of law that the mere execution of the separate leases to Cosden Oil & Gas Company and to John Wagner created no relationship of cotenancy, or any privity or community of interest between such lessees and that no such relation, or any relation of partnership or agency was created by any subsequent acts or conduct of Wagner or his associates."

The latter part of the above proposition has already been considered, and it has been determined that the Mid-Continent Petroleum Corporation was not the partner or agent of Wagner and his associates. In order to properly consider the effect of the failure to enter and drill on the right of Wagner to participate in the proceeds of the production as a cotenant, we will assume for the present the continued existence of the lease of Wagner and his associates.

Counsel for the plaintiff say in their brief that this case apparently "is without parallel in the books, and the questions involved must be decided upon the application of fundamental principles."

We regard the right of a nonconsenting cotenant to demand an accounting of the proportionate share of the oil and gas produced by his cotenant to be the settled law of this state. The case of Prairie Oil & Gas Co. v. Allen, supra, and the authorities therein reviewed, are ample authority for the proposition that a producing lessee is a cotenant with the cotenants of his lessors. Thus the scope of inquiry is narrowed to the question: Is the lessee under a separate lease from another cotenant a tenant in common prior to entry? In the Prairie Oil & Gas Case, supra, there was no lessee before the court who had not entered upon the premises and drilled. However, in that case it was stated **"Upon entry** it (the lessee of one cotenant) became a tenant in common with Lizzie Allen (lessor's cotenant) during the continuation of the lease." The language of the court was dictum in so far as it intimated that entry was necessary to make a lessee a cotenant. In the case of Riddle v. Ellis, 139 Okla. 68, 281 P. 286, this court said in syllabus, paragraph 6:

"A tenant in common in oil and gas underlying land may not make a valid lease of the whole common property, but may lease his undivided interest therein, and his lessee becomes for the time being tenant in common with other owner."

While the facts in this case are not such that the case can be said to be controlling on the issues in the case at bar, it is worthy of note for the reason that the Prairie Oil & Gas Company v. Allen Case, supra, was therein considered by this court in determining the validity of a lease given by one tenant in common under which the **lessee had not entered.** The court in that case declared such a lessee to be a cotenant and attached no importance whatever to whether the lessee had entered or not.

In considering whether Wagner and his associates, the nonentering lessees, were cotenants, it should be borne in mind that, in connection with tenants in common, the manner in which the interest of a cotenant is acquired is of no importance, and it is not necessary that any privity of contract exists between cotenants, as was said in 7 R. C. L. page 815:

"A tenancy in common is characterized by a single unity, that of possession or of the right to the possession of property; and this, irrespective of any other unity as of time, tenure, or estate. It follows that to be a tenant in common, one must have such a title as will authorize him to take and hold possession, and if he can never be entitled to the possession or the control of the property, he cannot be a tenant in common. Therefore, if two or more persons are entitled to land in such manner that they have an undivided possession, but several freeholds, they are tenants in common."

Applying the rule announced above to the case at bar, it is apparent that the actual physical possession of the common property is not indispensable to the existence of the relationship of cotenancy, it being sufficient if the party claiming to be a cotenant has the right of possession. Did Wagner and his cotenants have the right of possession by virtue of the execution of their lease? We think that this is a question that is not open to serious doubt in this jurisdiction. This court has many times said that a lease confers upon the lessee the right to use and occupy so much of the surface of the land as is necessary to explore the premises for oil and gas, and to take therefrom those products so long as the same are found in paying quantities. F. C. Carter, State Auditor, v. Rector, 88 Okla. 12, 210 P. 1035; Papoose Oil Co. v. Swindler, supra.

A great deal has been said in the previous decisions of the court concerning the nature of the property rights which the lessee obtains by virtue of his lease. Various refinements of legal reasoning have been employed to properly classify these rights in accordance with the time-honored terms applied to property real and personal. We do not deem it necessary to undertake to add to these previous discussions. Regardless of the name properly applicable, the decisions are in practical accord that the lessee has the right to enter upon the premises for exploration, development, and production under his lease, and the right to occupy so much thereof as is necessary to a proper accomplishment of the end. Thus prior to the entry of the Mid-Continent Petroleum Corporation upon the premises involved in this action, both the Mid-Continent and Wagner and his associates possessed identical rights to enter, explore, and develop such property. After entry by the Mid-Continent, Wagner and his associates still possessed their right of entry under their separate lease. The only practical difference was that one lessee was exercising its right, and the other was not. So far as the existence of the relationship of cotenancy is concerned to the common property, we regard this as a distinction without a difference. The lessee prior to entry obtain under their leases a species of property right possessory in its nature in which a tenancy in common might exist. It is said in 7 R. C. L. 818:

"A tenancy in common may exist in every species of property real, personal, or mixed, corporeal or incorporeal."

In the case of Barrett v. Buchanan, supra, the plaintiff had purchased an undivided interest in a lease prior to entry and development, and this court said concerning that transaction:

"When plaintiff purchased an undivided one-half interest in the oil and gas lease, he became a tenant in common with Buchanan."

We thereby recognized that the owners of a leasehold interest might be cotenants prior to entry. In Mills-Willingham text on Law of Oil and Gas, entry was not included as a necessary element in the rule of cotenancy announced at page 264:

"In those states where a lease by one cotenant is valid as to the other tenants in common, the lessee of one cotenant becomes a tenant in common with the cotenants of his lessor, in the subject-matter of the lease."

In the case of York v. Warren Oil & Gas Co. (Ky.) 229 S. W. 114, it was said in defining the rights of cotenants and their lessees, that:

"The appellee had the right, at any time after the execution of the lease to it, to go onto any part of the lands described and drill for oil and gas, and take, remove, and

market the same, subject to the right of the other joint owner to an accounting of the royalties, or demand a division of the minerals thus mined from the premises, subject only to the reasonable cost of producing same.

"As the daughter, an owner of a one-half undivided interest in the lands, had the right as a cotenant to go upon and use any part of the farm for agricultural purposes, or to mine and remove minerals therefrom, accounting to her co-owner for his share of the same, so she could lease her interest in the land and empower her lessee to do any and all the things which she could herself have done had she desired to explore the premises for oil and gas. While she and her lessee had the right to the surface for the purpose of exploring for, mining, and marketing the oil and gas, this use of the surface was not and could not be exclusive but subject always to the same right of the other cotenant. Had the son who owned the other one-half undivided interest in the land, leased it to another company, both companies would have enjoyed the privilege of entering upon and using the surface of the lands while drilling for oil and gas to the same extent as their grantors could have done, each respecting the prior location and improvements of the other, and accounting to the cotenants for their respective interests in the oil and gas produced. This is but an application of the well-known rule governing cotenants of real property."

While the authorities mentioned above are not based upon problems which are identical to the problems in the case at bar, we regard the language therein used as strongly persuasive and in accordance with sound legal principles. The execution of the lease by a cotenant created in the lessee such right to the possession of the premises described in the lease as to make him a cotenant with the cotenants of his lessor. An actual physical possession is not essential to the existence of such cotenancy, the right of possession being sufficient. As stated above, tenants in common have only the unity of possession or the unity of right of possession, and this unity of the right of possession exists in different lessees under separate leases from several cotenants prior to entry thereunder, and such lessees are therefore tenants in common. It follows that since there are tenants in common, each lessee may require an accounting from the other lessee who produces oil or gas from the common premises. Not only does this view seem to us to find support and approval in this and other courts, but it is in accord with the principles of justice and offers the most practical solution of the problems before us. Especially when we take into consideration the

fugacious nature of oil and gas, and the fact that the same is produced from a source of supply which may be exhausted by use.

To test the application of the rule and compare it with the rule contended for by the plaintiff, let us assume a concrete situation in which three owners of an undivided one-third interest in the same land have executed separate leases for a five-year term to lessees, A., B., and C., respectively. Each of the leases providing for termination at the end of one year unless drilling is commenced or delay rentals paid. The lessees, A., B., and C., refuse to co-operate with each other in development. A. enters and and commences drilling operations individually, and progressively explores and develops the premises for oil and gas until he is producing thousands of barrels daily. B. enters and drills one well, which has a daily production of 10 barrels. C. chooses not to drill, but to keep his lease in force by payment of delay rentals. The source of common supply is being constantly depleted by production, and in an inverse ratio the value of each of the leases is decreasing. A. and B., having entered, are cotenants, and B., under the holding of the Prairie Oil & Gas Case, supra, is entitled to share in the net proceeds of all production, he having entered upon the premises though his production is only nominal in amount. Under the view urged by the plaintiff, C., although his lease is in force by virtue of the payment of delay rentals, and although the value of his leasehold interest is being depleted during the term of his lease by production, can recover nothing because he had not entered. We see no reason for distinguishing between B. and C. The right of possession should and does make C. a cotenant.

The result of adopting plaintiff's view would be even more injurious to those lessees acquiring leases of small fractional interests. The size of their interest might make it impractical for them to develop on light producing property. Lessees of major fractional interests, knowing that the lessees of the smaller interests could not participate in production without entry, might be tempted to refuse to co-operate, thereby playing a "freeze out" game. On the other hand, making them cotenants during the period of their lease will encourage the lessee of the major fractional proportions of the premises to permit lessees of small fractional portions to co-operate in drilling operations on the common property. The holding in the subsequent portion of this opinion that the lease expired at the end

of the explanatory period unless drilling and production had been accomplished by the lessees themselves, will encourage the lessees of small fractional interests to cooperate in drilling enterprises and pay a proportionate share of the burden thereof to prevent the expiration of their leases.

We, therefore, conclude that the lessee of a cotenant under an oil and gas lease becomes a cotenant with the cotenants of his lessor upon execution and delivery of the lease, and remains such during the period of his lease, regardless of whether he enters upon the premises and drills or not. The different lessees for different cotenants are cotenants with each other, and as such cotenants they are liable to account to each other for the oil and gas produced from the common premises. The failure of a lessee to enter and drill, however, may operate to terminate his lease, in which case he ceases to be a cotenant.

This brings us to a consideration of the next contention of the plaintiff in this case, which is stated in their brief in the following language:

"By the failure of John Wagner and his assignees to exercise the privilege and option granted by the Wagner lease within the time there stipulated, such lease automatically terminated on November 20, 1926."

Delay rentals were paid by Wagner in November of 1925, which, under the provisions of the lease, operated to extend the time within which drilling could be commenced until November, 1926. Subsequent to that time no delay rentals had been paid by Wagner and his associates, and as we have already determined in the previous portion of this opinion, they did not drill. However, the Mid-Continent had commenced drilling and discovered oil and gas in paying quantities prior to November, 1926. This presents the question. Did the drilling by the Mid-Continent, in which Wagner did not participate, operate to extend the terms of the lease held by Wagner and his associates? The answer to this question depends upon the construction of the lease contract.

The lease in question was what is commonly known as an "unless lease." Such a lease differs from an "or" lease in that it terminates by its own terms upon failure to drill or pay rentals in accordance with the provisions thereof. As is said by Mills-Willingham in their work on Oil and Gas, on page 131:

"The 'unless' form of lease is so worded that, although the lessee may defer the drilling of the well, by the payment of rental, there is no covenant to drill or to pay rental upon which there could be a recovery by the lessor. Under this form of lease, the authorities are practically agreed that the lease terminates, ipso facto, upon breach without the necessity of demand of performance."

This view is supported by the decisions of this court. Northwestern Oil & Gas Co. v. Branine, 71 Okla. 107, 175 P. 533; New England Oil & Pipe Line Co. v. Rogers, 154 Okla. 285, 7 P. (2d) 638; Graves v. Nichlos, 151 Okla. 27, 1 P. (2d) 708.

In the last case, Mr. Justice Andrews, speaking for this court concerning the effect of an "unless" lease, said:

"The defendant was therein given the option of terminating the lease at the end of one year by failing to commence a well, or pay or tender rentals, but the defendant was not given any other option to terminate the lease."

The lease in question contained two provisions which we deem important in arriving at a proper answer to the question under consideration. It provides:

"It is agreed that this lease shall remain in force for a term of five years from this date, and as long thereafter as oil or gas, or either of them, is produced from said land by the lessee."

This provision is definite and explicit to the effect that in order for the lease to extend beyond the five-year term therein provided, production must be accomplished by the lessee. The Mid-Continent Petroleum Corporation was not the lessee.

With reference to the payment of delay rentals in order to extend the time for commencement of a well, the lease contains a definite provision which reads:

"If no well be commenced on said land on or before the 19th day of November, 1925, this lease shall terminate as to both parties, unless the lessee on or before that date shall pay or tender to the lessor or to the lessor's credit in the First National Bank at Stroud, Okla., or its successors, which shall continue as the depository regardless of changes in the ownership of said land, the sum of $9.70, which shall operate as a rental and cover the privilege of deferring the commencement of a well for 12 months from said date. In like manner and upon like payments, or tenders, the commencement of a well may be further deferred for like period of the same number of months successively."

This clause differs from the one first above quoted, in that it is silent as to who shall drill, and to the extent of this omission it may be said to be ambiguous.

Ordinarily, the manner in which a contract shall be interpreted is a question of law for the court, and if it were not for other considerations extrinsic to the lease itself, we would without hesitation hold that drilling, in order to comply with the last-quoted portion of the lease, must be done by the lessee himself. This for the reason that the lease provides for the payment to the lessor of 1/8 of 2/33 of the oil and gas produced by the lessee upon the premises. Such contracts are almost universally held to be made for the general purpose of developing the premises by the lessee, and the uniform tendency on the part of the courts has been to place such a construction on their terms as will carry out the terms, intent, and purpose of the agreement. The contract being executed for the purpose of procuring development upon the premises by the lessee, the clause should be interpreted to mean that the lessee is required to do the drilling, and that the act of a third party independent of any co-operation on the part of the lessee, is not a compliance with the terms of the lease. A contrary construction on the terms of the lease would sanction holding the lease for speculative purposes, which is in direct conflict with the primary purpose for which such a lease is executed. It is said in the recent edition (1932) of Thornton on Oil and Gas:

"An oil or gas lease cannot be held for merely speculative purposes. No lease of land for a rent for a return to the landlord out of the land which passes can be construed to be intended to enable the tenant merely to hold the lease for purposes of speculation, without doing and performing therewith what the lease contemplated. Such a construction would, indeed, make all such contracts a snare for the entrapment and injury of the unwary landlord."

In connection with whether the drilling must be done by the lessee, we find the following competent statement in Summer's work on Oil and Gas, page 296:

"The habendum clauses of leases usually provide that the discovery and production of oil or gas on the demised premises, to continue the life of the lease beyond the fixed term, must be by the lessee or his assigns, but in absence of such a clause, a production of oil or gas from the premises by another, without the lessee's assent and against his will, will not extend the lease beyond the definite term."

The lessor, however, may so conduct himself as to be estopped from asserting that the lease has terminated as is said in the work on Oil and Gas by Mills-Willingham, page 132:

"Notwithstanding a breach of condition may have occurred, which, under the forfeiture clause, authorized the termination of the lease, the lessor may waive such default, or under the 'unless' form, estop himself from claiming the forfeiture, where, by his conduct, he has recognized the lease as being still in force, or has encouraged the lessee to proceed, upon the belief that a forfeiture will not be declared. Thus an acceptance of rental, after it is due, is a waiver of the breach."

The parties to the lease contract may also place such a construction upon the ambiguous provisions thereof as to preclude the court from exercising its best judgment in interpreting the same.

This brings us to a consideration of the last contention of the plaintiff, which appears in the brief in the following language:

"That the plaintiff in error is not precluded from asserting the termination of the Wagner lease, or from maintaining this suit by any act or conduct of his operating by way of (a) waiver, (b) estoppel, or (c) ratification."

This is but a denial of the affirmative claim of Wagner and his associates that the plaintiff is estopped to assert that their lease has terminated or has waived his right to declare the same to have ended.

The plaintiff urges that the failure of Wagner to drill or pay rentals caused the lease to terminate in November of 1926. Wagner and his associates assert that the plaintiff is estopped to make such a claim for the reason that prior and subsequent to November, 1926, he had continuously received royalty from the Mid-Continent Petroleum Corporation; that he had signed division orders recognizing Wagner and his associates to have an interest in the production, and that, in general, up until a time shortly preceding the commencement of this action, he at all times treated their lease as valid and subsisting, and treated the drilling of oil and gas on the premises as constituting a compliance with the lease. The plaintiff Earp, as an excuse for this course of conduct, states that he was laboring under the mistaken impression that Wagner and his associates were co-operating with the Mid-Continent in the development and production. He claims to have labored under this impression until he was informed to the contrary by the attorney for the Mid-Continent Petroleum Corporation. He thus explains his delay in asserting that the lease had terminated. Plaintiff does not, however, urge that Wagner and his associates misrepresented the facts to him concerning their relationship with the Mid-Continent Petroleum Corporation,

nor did the plaintiff communicate to the defendant Wagner and his associates his mistaken impression concerning their connection with that corporation.

The delay rentals provided by the lease were for a nominal amount, and it seems obvious that had Wagner and his associates thought any question might be raised concerning its duration, they would have paid the same. Such an act would have been one of ordinary prudence.

It is urged that by the acceptance of the benefits of the lease in the form of 1/8 of 2/33 of the oil and gas produced, the plaintiff has received the benefits of their lease, and therefore cannot deny its existence. This argument seems to be of slight weight for the reason that, had the lease to Wagner been terminated, plaintiff and his grantees would have received 2/33 of the net proceeds which would have included 1/8 of 2/33 which he actually received, plus the amount Wagner and his associates might rightfully claim during the continuation of the lease. The so-called benefits were not conferred upon the plaintiff Earp by virtue of the Wagner lease, but rather because of the interest which the plaintiff had in the premises and by virtue of the development of such premises by the Mid-Continent under a lease contract to which neither the plaintiff nor Wagner and his associates were parties. Therefore, it cannot be said that the plaintiff Earp was receiving benefits under the lease with Wagner.

We do, however, attach controlling importance to the general conduct of the plaintiff in treating the lease in existence before and after the termination of the period to which it had been intended by the payment of delay rentals. By such conduct on the part of the plaintiff, John Wagner and his associates were lulled into a feeling of security concerning the existence of their lease. In all justice the plaintiff should not be permitted to recede from his former attitude and assert that the lease had terminated in November of 1926, without notifying Wagner and his associates of such change of attitude and giving them an opportunity to comply with the provisions of the lease.

Counsel for the plaintiff contends, however, that all of the elements necessary to a true estoppel are not present in the acts and conduct of the plaintiff. This contention is not without merit, and certainly would be entitled to a careful analysis except for the existence of a stronger legal reason upon which the same result should

be reached. That is, that the parties themselves place a construction upon the provisions of the lease contract of Wagner which renders the drilling by the Mid-Continent a compliance therewith. It is a reasonable and proper deduction from the evidence in this case that previous to the time the plaintiff was interviewed by the representatives of the Mid-Continent Petroleum Corporation, all of the parties interested in these premises regarded the lease of Wagner to be in force within the five-year exploratory period because of the drilling operations of the Mid-Continent Petroleum Corporation, and that such drilling operations satisfied the requirements of the lease so far as the option to pay delay rentals was concerned. It has already been pointed out that the clause in the lease authorizing drilling to be deferred by the payment of delay rentals was ambiguous and was uncertain as to whether such drilling must necessarily be the act of the lessee or some third party, in this case the Mid-Continent Petroleum Corporation. Being ambiguous, the contract, of course, should be interpreted according to its general purpose and to the end to be accomplished thereby, unless some other and contrary interpretation has been placed upon the ambiguous portion thereof by the parties themselves. In such a case the construction of the parties would be a matter of considerable weight and ordinarily should control. As was said by the Federal Circuit Court of Appeals in the 10th Circuit in the recent case of Hopkins v. Texas Co., 62 F. (2d) 691:

"The mutual interpretation of the lease contracts affords cogent evidence of their meaning."

Contemporary construction by the parties is ordinarily limited in its applicaton to those provisions of the contract which are doubtful or ambiguous in their meaning. 7 R. C. L. 852. **This lease specifically provides that in order to extend the same beyond the five-year period, production must be accomplished by the lessee. It provides that in order to obviate the necessity of paying delay rentals to extend the term of the lease beyond one year, a well must be drilled on the premises, but does not say whether the same shall be drilled by the lessee or some other person.** Apparently all of the parties treated the drilling of the Mid-Continent Petroleum Corporation as sufficient compliance with the last-mentioned provisions of the lease until the attorney for the Mid-Continent Petroleum Corporation conceived the idea that the drilling would have to be done by the lessee. The only briefs

filed by the Mid-Continent Petroleum Corporation are filed in cause No. 21946, and on oral argument these two causes were presented together. The attorneys for the Mid-Continent Petroleum Corporation in their brief say:

"However, sometime after the commencement of the case at bar, and when the writer of this brief was preparing to file herein an answer, two thoughts occurred to him: (1) Assuming that the plaintiffs' (Wagner and associates) lease was a good, valid, and subsisting lease, what was there in such lease which would entitle the plaintiffs (Wagner and associates) to any oil or gas which was not produced either directly or indirectly thereunder, when the party or parties producing such oil or gas had not ousted the plaintiffs from the premises involved or in any way prevented them from exercising their rights thereunder? and (2) since the plaintiffs' lease absolutely required them either to drill or to pay rentals, and they neither directly nor indirectly drilled and had failed to pay the necessary rentals, was not their lease at an end? Reflection upon these two thoughts persuaded us that both of said questions would have to be decided against the plaintiffs, but that, in any event, Claud Russell Earp, the plaintiffs' lessor, had such a claim or interest in and to the oil and gas involved as to make him not only a proper, but a necessary and indispensable party to the case at bar. Therefore, as the record discloses, two of the attorneys for the defendants advised Claud Russell Earp of the aforesaid views, whereupon he employed counsel, who first sought to intervene in the case at bar, and thereafter filed the above referred to civil action, No. 10166. The court will, therefore, see that the position of the defendants with reference to the lease of the plaintiffs, which as before stated, was not taken until after the commencement of the case at bar. * * *"

That such was the interpretation of the contract until shortly before the commencement of this action is reflected in the testimony in the case before us upon the cross-examination of Mr. R. H. Willis, attorney for the Mid-Continent Petroleum Corporation. We quote:

"Q. (by Mr. Blakeney); Now, you conceived that that would be a good way to start a fire under the claim of John Wagner, to stimulate this boy to commence a suit to set aside John's title, didn't you? A. No, that is not exactly true, Mr. Blakeney: however, I figured Mr. Earp. in **asserting the claims we gave him to understand he was entitled to assert, would be very much concerned over it.**"

We, therefore, conclude that the lease contract under consideration was sufficiently ambiguous **as to who should drill upon the premises in order to render unnecessary the payment of delay rentals** as to authorize controlling weight to be given to a contemporary construction of the contract by the parties, and that the evidence reasonably supports the view that the plaintiff and defendants interested in the Wagner lease placed such a construction upon the terms of the contract as to make the drilling of the Mid-Continent Petroleum Corporation a compliance with a portion thereof, which requires that delay rentals be paid from year to year, or drilling be commenced on the premises. Inasmuch as the drilling by virtue of the terms of the contract must be by the lessee in order to extend the terms thereof beyond five years, and there being no ambiguity in that provision of the contract, the contemporary construction of the parties cannot govern on this point, and the drilling of the Mid-Continent cannot extend the lease beyond the five-year term.

In conclusion, it should be stated that the division of the oil from the premises should be as follows:

1. The Mid-Continent Petroleum Corporation is liable to account to Earp and his grantees and Wagner and his associates for 2/33 of the market value of the oil and gas produced from the premises after deducting the reasonable and necessary cost of developing, extracting, and marketing the same. This duty to account arises by reason of the existence of the relationship of cotenancy.

2. There being no contractual relationship between the Mid-Continent and Earp or the Mid-Continent and Wagner, there is no duty on the part of the Mid-Continent to account to either of them until the reasonable and necessary cost of developing, extracting, and marketing the oil has been satisfied.

3. After production has passed a point when the costs have been satisfied, the question of division between Earp and Wagner arises. This depends on the contract between them. Under its terms Earp is entitled to receive 1/8 of 2/33 of all the oil and gas produced. This is based upon the amount of production from the beginning and until Earp has received an amount equal to 1/8 of 2/33 of all oil and gas produced until the Wagner lease expired by its limitations, to wit, five years, Wagner and his associates are not entitled to anything.

4. During this five-year period, and after Earp has received 2/33 of 1/8 as set out above, then Wagner and his associates are thereafter entitled to receive the remainder

of 7/8 of 2/33 of all the oil and gas produced less 2/33 of the reasonable and necessary cost of extracting and producing and marketing all of the oil and gas products. The right of Wagner and his associates to participate in the proceeds of the oil and gas depends on their lease and ceases upon its termination. It is extended by the drilling of the Mid-Continent during the exploratory period of five years by reason of the contemporary construction of the parties, but terminates at the end thereof.

5. At the termination of the five-year period of the Wagner lease, then Wagner's right to participate in the proceeds of the lease ends and thereafter Earp shall receive 2/33 of the net profits of the lease without regard to any 1/8 royalty.

The judgment of the trial court is, therefore, modified to conform to the views herein expressed, the duration of the Wagner lease being limited to five years, and as so modified the judgment is affirmed, and the case is remanded to the trial court for accounting in accordance with the views herein announced and the decision of this court in the case of Moody v. Wagner, supra, as per stipulation between the parties on the trial hereof.

CULLISON, V. C. J., and SWINDALL, McNEILL, and BAYLESS, JJ., concur. RILEY, C. J., and OSBORN, J., dissent. ANDREWS, J., disqualified. WELCH, J., absent.