Herbert W. SEABOLT and Carlotta Seabolt, Plaintiffs in Error,

v.

Margie OGILVIE, Guardian of the Person and Estate of Eula Mattie Elmore, an Incompetent Person, Defendant in Error.

No. 41736.

Supreme Court of Oklahoma.

Jan. 7, 1969.

Pitcher, Logan & Lowry, by George P. Pitcher, Vinita, for plaintiffs in error.

Wilcoxen & Gephart, Andrew Wilcoxen, Muskogee, John M. Gephart, Wagoner, for defendant in error.

WILLIAMS, Justice.

This is an appeal from a judgment below cancelling a deed executed by Eula Mattie Elmore which conveyed a certain tract of land in Mayes County, Oklahoma. The action below was initiated by Margie Ogilvie, Guardian of the Person and Estate of Eula Mattie Elmore, an incompetent person, against the grantees of the property, Herbert W. Seabolt and his wife, Carlotta Seabolt. On appeal, the parties appear in reverse order from that in the trial court,

but hereinafter will be referred to as they appeared below.

In her petition filed below, plaintiff alleged that Eula Mattie Elmore was a mentally incompetent person and that defendants took advantage of this incapacity to procure her execution on October 24, 1958 of a deed conveying to them a certain 250-acre tract of land located in Mayes County, Oklahoma. Plaintiff also sought to recover from defendants the proceeds of eight U. S. Government bonds in the amount of $1,000.00 each and of an insurance payment in the amount of $4,000.00 for a fire loss, and to secure the release of Mrs. Elmore from a mortgage to the Federal Land Bank in the amount of $10,500.00, which she co-signed with defendants. These proceeds and her execution of the mortgage were also allegedly procured by defendants taking advantage of Mrs. Elmore's mental incapacity.

For many years, Mrs. Elmore and her husband lived on the above described tract of land in Mayes County. Due to Mr. Elmore's failing health, they moved into Pryor in June, 1955. Mr. Elmore died in September, 1955. The couple had had no children, although Mr. Elmore left a surviving son by a previous marriage.

Immediately after the Elmores moved into Pryor, defendants, who were then living on a nearby farm, and who had been friends of the Elmores for some years, moved into the dwelling located on the Elmore farm. The farm land itself had been previously rented to a third party, but when this lease terminated in January, 1956, defendants leased the farm for the annual cash rental of $700.00. This rental was said to have been paid for the years 1956, 1957 and 1958.

In October, 1958, the dwelling on the Elmore farm burned and was a total loss. Subsequent to this fire, Mrs. Elmore went to defendants and told them that since she had already provided in her will that they were to receive the farm at her death, she would deed the property to them immediately. This offer by Mrs. Elmore apparently was to aid in the reconstruction of the dwelling. Thereafter, Mrs. Elmore and defendant Herbert W. Seabolt went to Pryor, where she obtained the abstract of title to the property and together they went to an attorney and had a deed prepared. Defendant Herbert Seabolt took this deed and had it recorded.

At the trial below, Mrs. Elmore testified that she had prepared, in 1956, with the aid of a third party, a holographic will. This will, which was admitted into evidence, provided that defendants were the sole devisees of Mrs. Elmore. Mrs. Elmore also testified that the deed which she executed was her idea, and was so executed, " * * * for them to take care of me the rest of my life, long as I lived to take care of me."

Mrs. Elmore carried insurance on the farm dwelling in the amount of $4,000.00, and when she received payment of this amount for the fire loss, she gave it to defendants for the reconstruction of the dwelling.

Defendants testified that they did reconstruct the burned dwelling at an approximate cost of $14,500.00. This new dwelling was financed by Mrs. Elmore's insurance payment and the proceeds received from a mortgage executed on the farm. There were actually two mortgages executed at the time the dwelling was being rebuilt. The first in the amount of $10,000, and dated in December, 1958, was executed only by defendants, while the second, (a sort of correction mortgage) also in the amount of $10,000, and dated in January, 1959, was executed by both Mrs. Elmore and defendants. A third (re-newed and increased) mortgage, in the amount of $10,500, and dated in 1962, was also executed by both Mrs. Elmore and defendants, the total amount due the Federal Land Bank at that time being in such latter amount.

Sometime in 1960, Mrs. Elmore moved to the farm and lived there with defendants and their children in the recently completed dwelling. While Mrs. Elmore was living with defendants, they cared for her, apparently purchased many of her necessities,

and, although she was able to drive a car, often drove her to various places. After living under this arrangement for some two and one-half years, Mrs. Elmore moved into a small apartment adjoining the garage near the farm residence. From the record, it is not clear whether she made this move of her own volition or on defendants' suggestion. While living in this apartment, Mrs. Elmore assumed a greater burden of caring for herself, although defendants allegedly continued to furnish her with some necessities.

Sometime after moving to the farm in 1960, Mrs. Elmore informed defendants that she had placed in their names as co-owners with herself eight U. S. Government bonds she had inherited from her husband. From her testimony at trial, Mrs. Elmore seemed to be of the impression that at least "two names" were required on such bonds. But she did state that she had placed defendants' names on the bonds as co-owners with the intention that they were to receive such bonds only after her death. However, defendants testified that she had given them the bonds and instructions to cash such bonds and place "some" of the proceeds in her account. Defendants maintained they had deposited some $200.00 of the bond proceeds in Mrs. Elmore's bank account and had altogether expended approximately $2,000 of such proceeds for her benefit. The balance of the bond proceeds, approximately $5,700, was expended by defendants on various things, including, allegedly, terracing, fencing and other improvements to the farm.

In 1964, Mrs. Elmore left the farm and returned to Pryor because of what she considered poor treatment received by her from defendants and their children. Sometime after returning to Pryor, Mrs. Elmore contacted plaintiff herein and plaintiff's husband, and expressed to them her feelings that she was incapable of handling her property and her desire to have a guardian appointed. Proceedings were then instituted in the County Court of Mayes County which culminated in the appointment of plaintiff as guardian of Mrs. Elmore. Thereafter, plaintiff brought the action below.

After hearing the evidence submitted, the trial court entered its judgment for plaintiff on her first cause of action to cancel the deed executed by Mrs. Elmore to the 250-acre tract of land, but entered judgment for defendants on plaintiff's other causes of action. From this judgment cancelling the deed and an order overruling their motion for new trial, defendants appealed.

Defendants herein, citing Duncan v. Burkdoll, 204 Okl. 574, 232 P.2d 151, contend that the mental capacity of a maker of a deed is to be presumed and the burden of proof as to the lack of this capacity is upon a party attacking the validity of the deed. Defendants also contend that the test of this capacity on the part of the maker is that grantor should have the ability to understand the nature and effect of the act in which he is engaged and the business he is transacting. See Scott v. Scott, 131 Okl. 144, 268 P. 245. Defendants argue that the evidence submitted below fails to overcome the presumption of Mrs. Elmore's capacity or to establish that she did not understand the nature and effect of her execution of the deed.

In Yarbrough v. Bellamy, 197 Okl. 493, 172 P.2d 801, we stated:

> "An action to cancel a deed is one of equitable cognizance, and the judgment in such an action will not be disturbed on appeal unless it is clearly against the weight of the evidence."

At trial, plaintiff submitted the testimony of two psychiatrists who had examined Mrs. Elmore in 1964. The first psychiatrist testified that Mrs. Elmore had an intelligence quotient (I.Q.) of 73, which would place her in the borderline mentally defective category. He stated that such persons could read and write and function in certain areas, but would not have a " * * * very practical assessment of reality with regard to things of great value." It was his opinion that Mrs. Elmore

" * * * was totally incompetent to handle her own personal affairs especially with respect to any sizeable sums of money," and that this condition had existed at least since 1955.

The second psychiatrist testified that he found Mrs. Elmore confused and that she had poor judgment and low intelligence. He stated that she could perform very simple addition and subtraction but could not multiply. In his opinion, Mrs. Elmore had an I.Q. of less than 90, and he did not think one with such an I.Q. would be one who could with mental competence dispose of her property in accordance with her wishes.

Plaintiff also submitted the testimony of several lay witnesses who had been acquainted with Mrs. Elmore for several years. These witnesses testified, in effect, that Mrs. Elmore was incapable of knowing the nature and consequences of her acts and was incompetent to transact business.

Defendants submitted the testimony of numerous witnesses relative to Mrs. Elmore's competency. One of such witnesses, a physician, testified that he had treated Mrs. Elmore for physical illness but not for mental illness. He expressed the opinion that she was competent. In summary, defendants' other witnesses, all lay persons who had been friends of Mrs. Elmore for quite sometime, related their observations of Mrs. Elmore which they had made at social functions and while she was attending to her duties as a farm wife, and expressed the opinion that she was mentally competent and able to understand the nature of her acts.

 As we stated in French v. Leachman, 258 P.2d 1204, 1206:

" * * * it is the province of the trial court in equity matters to determine the credibility of the witnesses and of the weight and value to be given to their testimony, and due regard must be given to the fact that the trial judge was present during the trial and that he saw the witnesses and heard their testimony."

Keeping this rule in mind, from a review of the record herein, it is our opinion that the judgment of the trial court was not clearly against the weight of the evidence.

The judgment of the trial court is affirmed.

JACKSON, C. J., and IRWIN, V. C. J., and BERRY, LAVENDER and McINERNEY, JJ., concur.