George H. MULLINS, Robert H. Mullins, Lee C. Hauschild and Beverly Gerard, Appellees,

v.

L.O. WARD, Ruth Mullins, Ladd Petroleum Corporation, Carl E. Gungoll, Kaiser Francis Oil Co., Hoover and Bracken Energies, Inc., Henry H. Gungoll Associates, B.P. Hall, Rod W. Ylitalo, Rocket Oil Company, Carolyn Houk, Gerald D. Neff, Francis Oil & Gas, Inc., George B. Kaiser, Ruth Nelson and Ernest L. Thomas, Appellants.

No. 61785.

Supreme Court of Oklahoma.

Dec. 24, 1985.

H.B. Watson, Jr., Richard K. Books, Stephen R. Pitcock, Watson & McKenzie, Oklahoma City, for appellees.

R.L. McKnight, McKnight, Gasaway, Beck, Seals & Smith, Enid, Carl Michael Smith, Gordon Brown, Brown & Lockhart, Oklahoma City, for appellants.

OPALA, Justice.

In this suit for accounting and cancellation of an oil-and-gas lease, four issues are tendered for our decision: [1] If a lessee enters and begins to drill a well with the acquiescence of some but not all cotenants in the mineral estate, is he liable to the nonacquiescing cotenants as a bad-faith trespasser? [2] Is the effective date of the Corporation Commission's [Commission's] despacing order dispositive on the issue whether the oil-and-gas leasehold in suit is subject to cancellation for want of production? [3] Did the trial court err in refusing to grant a jury trial and in depriving the mineral owners' of an opportunity to secure an award of punitive damages? and [4] Did the regulatory orders of the Commission operate effectively to destroy the lessees' right in property to protect their mineral lease by drilling? We answer all four questions in the negative.

The plaintiffs [owners] are cotenants of an undivided mineral estate in 72 acres of land that is included in a 160-acre oil-and-gas lease which was initially situated within a 640-acre drilling and spacing unit. With its primary term ending *March 8, 1977*, this lease was participating in production from a well located outside the leased premises but within the unit. In November 1976 the owners sought to change the spacing regime from a 640-acre unit to 80-acre units. Ladd Petroleum Corporation [Ladd or lessee], who also was the unit operator,

opposed despacing because the proposed 80-acre unit that was to be formed in the area where the owners' mineral estate was situated would then be left without a producing well. Following a contested hearing, the Commission's trial examiner recommended, on *March 16, 1977*, that spacing be reduced to 80-acre units. Since this change, if adopted by the Commission, would cause the owners' lease to terminate for want of production past the primary term, Ladd immediately applied to increase density in the then existing 640-acre unit by drilling forthwith another well within the proposed 80-acre unit that might be formed over the owners' leased premises. The Commission acceded to this request. The lease was then "farmed out" to L.O. Ward [Ward or lessee] who, on April 7, 1977, commenced drilling a well [the Mullins well] on the owners' mineral estate. The emergency order was later held to be invalid by an opinion of the Court of Appeals.[1]

The Commission's April 27, 1977 order (a) changed spacing to 80-acre units and (b) established *December 3, 1976* as the effective date of the order. The latter date coincides with that originally set for hearing the owners' despacing application. A "correction order," subsequently issued, *postponed* the effective date of the despacing order *from December 3, 1976 to April 27, 1977*. On February 19, 1980, Ward secured from the Commission a well location exception which confirmed the Mullins well as the authorized well for the new 80-acre spacing unit. This order was given retroactive effect from April 27, 1977.[2] None of these orders was appealed.

In the wake of these events, the lessees, together with two of the cotenants,[3] took

---

1. The Court of Appeals reversed the Commission's regulatory order as unsupported by any evidence. [Cause No. 50,939, unpublished opinion of May 15, 1979].

2. The Court of Appeals' reversal of the emergency order was handed down May 15, 1979; its mandate issued on July 26, 1979. The lessees' application for a well location exception was

filed October 8, 1979 and was approved February 19, 1980.

3. These two cotenants, Carolyn Houk and Ruth Mullins (now Seger), were successors in interest to the lessor of the 160-acre lease, the owners' predecessor in title. On their refusal to join in the litigation as plaintiffs, these cotenants were brought into the lawsuit as parties-defendant. They seek no relief in this case.

the position that the lease continued in effect. The owners, on the other hand, regarded the lease as having expired. They brought this suit against lessees (a) to quiet their title to the mineral estate, (b) to secure an accounting for production obtained by the lessees, (c) to assess the damages caused by the lessees' wrongful entry in trespass, and (d) to cancel the lease because of the lessees' failure timely to drill a well within the primary term. The case came to trial upon stipulations. The critical issue, as framed and submitted by the parties, was the legal efficacy of the correction order that postponed the effective date of the despacing order.[4] '

The district court ruled that (a) the "correction order" was facially void because the Commission lacked jurisdiction to enter it,[5] (b) the lease had terminated at the end of its primary term on March 8, 1977, and (c) Ward and Ladd were bad-faith trespassers. The decree ordered an accounting for the owners' pro rata share of the *gross profits* the lessees derived from the well. Lessees, who as bad-faith trespassers were denied credit for their drilling and operating costs,[6] brought this appeal. The owners counter-appealed. The latter complain

of the trial court's refusal to grant them a trial by jury and hence an opportunity to secure a punitive damages award.

**I**

## THE IMPACT OF REGULATORY ORDERS AND PROCEEDINGS

In their district court suit, the owners tendered the regulatory orders of the Commission as dispositive of the controversy over the termination of the lease for want of production. The lessees, on the other hand, urged they were vigilant in protecting the lease by promptly drilling within the new 80-acre unit.

### A. *The Correction Order*

■ The lessees sought by a nunc pro tunc order—entered by the Commission without application, mailed notice, or hearing—to correct the April 27, 1977 despacing order by changing its effective date from December 3, 1976, the date initially set for a hearing on despacing application, to April 27, 1977, the date the order was actually entered. The owners launched below a collateral attack on the correction order[7] as facially void because it undertook

---

**4.** *According to the arguments advanced by the parties, if the "correction order" were valid and the effective date of the respacing order was April 27, 1977, then there would not have been a trespass by the lessees when the April 7, 1977 well was drilled. Since the owners' land would still have been located within the 640-acre spacing unit that contained a producing well, the lease would be considered held by production when Ward commenced drilling the Mullins well on April 7th. On the other hand, if the Commission's "correction order" were facially void, then the effective date of the respacing order would be the date shown in that order— December 3, 1976. Since there would not have been a producing well within the 80-acre unit that embraced the owners' mineral interest between December 3, 1976 and March 8, 1977, the primary term of the lease could not be extended by production past March 8, 1977. Because the lease would have expired on March 8, 1977, the lessees would be deemed to have trespassed when they commenced drilling on April 7th.*

**5.** The trial court's initial ruling that the correction order was facially void antedates its judgment. The terms of the judgment are entirely consistent with, and premised on, that ruling.

**6.** Because the two cotenants did not seek affirmative relief, the trial court excluded them from the benefit of an accounting.

**7.** A collateral attack on an order of the Commission which is not facially void is impermissible. Art. 9 § 20, Okl. Const. and 52 O.S.1981 § 111. The district court's inquiry into the validity of Commission orders stands confined to determining, from an inspection of the face of the proceedings [i.e., the application, the process by which the parties were notified and the Commission's order], if the Commission had jurisdiction to issue the order. *McDaniel v. Moyer,* Okl., 662 P.2d 309, 312 [1983]; *Chancellor v. Tenneco Oil Company,* Okl., 653 P.2d 204, 206 [1982]; *Gulfstream Petroleum Corp. v. Layden,* Okl., 632 P.2d 376, 379 [1981]; *Woods Petroleum Corp. v. Sledge,* Okl., 632 P.2d 393, 396 [1981] and *State v. Corporation Commission,* Okl., 590 P.2d 674, 677 [1979]. A Commission order is deemed void when the face of the record reveals that at least one of the three elements of agency jurisdiction was absent, i.e., jurisdiction over the parties, jurisdiction over the subject matter or jurisdictional power to pronounce the particular decision that was rendered. *Gulfstream Petroleum Corp. v. Layden, supra* at 379.

adversely to affect their mineral estate without meeting the minimum standards of due process for adequate notice and adversary hearing.

▮ When acting in its adjudicative capacity, an administrative agency is subject to due process requirements not dissimilar to those which apply to judicial bodies.[8] A nunc pro tunc order[9] that *materially affects the rights of a party* is ineffective if it was issued without prior notice and hearing.[10] We therefore hold that the ex parte correction order which sought to postpone the effective date of the agency's prior despacing order is facially void. Insofar as Corporation Commission Rule 26(c) is relied upon broadly to justify a noticeless correction process, it suffices to say that the rule may not be invoked when the correction or change to be proposed in the order will adversely affect a party's interests.[11]

B. *The Retroactive Despacing Order*

The trial examiner's March 16, 1977 report to the Commission recommended that the 640-acre unit be reduced to 80-acre units. Following this recommendation, the Commission entered its despacing order on April 27, 1977 and established December 3, 1976 as its effective date. This was the date initially set for a Commission hearing on the despacing application.

▮ The retroactive despacing order is challenged as invalid because there is no evidentiary support for giving it retroactive effect. This argument may not be entertained. It is not directed to the order's *facial invalidity*—the only basis upon which a district court attack may be sustained. Error that claims an absence of sufficient evidentiary support for a Commission order is barred from district court cognizance as an impermissible collateral attack.[12]

---

**8.** When the Commission acts in an adjudicative capacity, it functions as a court. The general norms of law which govern the quality of notice that must be given in proceedings conducted by judicial tribunals apply with the same force and effect to the Commission. *Monson v. State ex rel. Okla. Corp. Com'n*, Okl., 673 P.2d 839, 841–842 [1983]. The minimum standards of federal and state due process must hence govern in spacing proceedings. *C.F. Braun & Co. v. Corporation Commission*, Okl., 609 P.2d 1268, 1273 [1980]. See also, *Wolfenbarger v. Hennessee*, Okl., 520 P.2d 809, 811–812 [1974].

**9.** A nunc pro tunc proceeding may be utilized only to supply a record of something that was actually done or decided but was incorrectly memorialized. *Central Oklahoma Freight Lines, Inc. v. Corporation Commission*, Okl., 484 P.2d 877, 878 [1971]. A nunc pro tunc proceeding cannot be used to modify or amend a former judgment to make it a judgment not rendered by the court. *Cartwright v. MFA Mutual Ins. Co. of Columbia, Mo.*, Okl., 499 P.2d 1380, 1382 [1972]. An order nunc pro tunc cannot be used to change or alter a previous decision correctly recorded. *Woodmansee v. Woodmansee*, 137 Okl. 112, 278 Pac. 278, 280 [1929]. Hence, the power to make corrections through a nunc pro tunc device extends only to *clerical* rather than *judicial* errors. *Pettit v. Arkansas Louisiana Gas Co.*, Okl., 595 P.2d 793, 794 [1979].

**10.** Notice is required when an applicant seeks to repeal, amend, modify or supplement a former

Commission order establishing a well spacing unit. 52 O.S.1981 § 87.1. It must be given in order to invest the Commission with jurisdiction to hear the issue. Want of notice is a violation of due process. *Carpenter v. Powel Briscoe, Inc.*, Okl., 380 P.2d 245, 247 [1963] and *Cravens v. Corporation Commission*, Okl., 613 P.2d 442, 444 [1980]. When a spacing order is sought to be corrected in a nunc pro tunc proceeding *by a provision that may adversely affect a party's interest*, advance notice and hearing are required. An administrative rule may not infringe on rights guaranteed by the constitution. See in this connection, *Armstrong v. Netherlands Pipeline Construction Co.*, Okl., 447 P.2d 762, 764 [1968] and *B.F. Goodrich Company v. State Industrial Court*, Okl., 429 P.2d 787, 789–790 [1967].

**11.** The lessees note that the Commission rules provide for a nunc pro tunc correction of its orders *without notice* or hearing. Rule 26(c), Rules of Practice of the Oklahoma Corporation Commission provides:

"Upon motion of any party, with or without notice or hearing, the Commission may make an order nunc pro tunc to correct any clerical errors, mistakes or omissions in an order, or otherwise to cause it to correctly reflect the judgment or action of the Commission."

**12.** See footnote 7 *supra* for an analysis of case law that restricts district court cognizance over Commission orders to ascertainment of their facial validity.

Although the district court properly viewed the correction order as inefficacious and the despacing order as having taken effect on December 3, 1976, it erred, for the reasons to be stated in Part III of this opinion, in treating this date as dispositive of the controversy over the owners' claim for cancellation of the lease.

### C. Emergency order authorizing lessees to drill and the Court of Appeals' reversal of that order

After the trial examiner had recommended that spacing be reduced to 80-acre units, Ladd, on March 31, 1977, applied for an emergency order to increase density in the then existing 640-acre unit by immediate commencement of another well within the proposed 80-acre unit. The emergency order which issued that day was merely provisional. Final disposition of Ladd's application was to be heard no later than April 27, 1977. Ladd entered into a farm-out agreement with Ward who, on April 7, 1977, commenced drilling operations on the owners' mineral estate.

■ The emergency order was later held to be invalid by the Court of Appeals for lack of any evidence to support it. The "settled law of the case"[13] that emerged from that reversal did not extend beyond invalidation of the challenged *regulatory emergency order* which had authorized the lessees to drill. The Court of Appeals neither reached nor settled in that opinion the critical question here which is how, if at all, the declared invalidity of the emergency order is to affect the lessees' right *in property* to protect their leasehold by additional production while the agency despacing process remains pending.

### D. Post-reversal order retroactively approving Mullins as the unit well

The despacing order established well location sites for each new 80-acre unit.

Since the Mullins well had not been drilled at the site authorized by the despacing order, Ward sought, on October 8, 1979, to cure that defect by securing from the Commission a well location exception. By its February 19, 1980 order the Commission approved the location of Mullins, thus confirming it as the authorized well for the unit. This order was given retroactive effect from April 27, 1977. No appeal was lodged from it.

## II

### ACCOUNTING–RELATED ISSUES

The owners sought a jury trial and an opportunity to secure a punitive damages award on the grounds that (a) the lessees' entry on the land was a trespass because it was made under an invalid emergency order and (b) the lessees' continued presence on the land, after the order had been held to be invalid by the Court of Appeals, constituted bad-faith trespass. The trial court's adjudication of the lessees' status as bad-faith trespassers and the award of gross production profits to the owners was clearly grounded upon the correction order's infirmity and on the application of the retroactive effective date to the despacing regime.

We do not agree that, under the facts of this case, the conclusion reached by the trial court was mandated by the correction order's invalidation. The impact of regulatory orders need not be inquired into in order to resolve the lessees' status. This is so because the two cotenants, who had refused to join in the litigation as plaintiffs, demonstrated clearly by their district court answers that they (a) had acquiesced in the lessees entering upon the land to drill the well, (b) had believed the lease was still in effect, and (c) had been accepting royalties from the lessees.[14]

---

**13.** The settled law of the case operates to bar relitigation *only* of those issues that have been settled by an appellate opinion. *Mobbs v. City of Lehigh,* Okl., 655 P.2d 547, 549 [1982].

**14.** In their answers, the cotenants responded as follows:

(a) Carolyn Houk (1) denied that she had an interest in obtaining the relief requested by the owners; (2) admitted she had general knowledge that an oil-and-gas well had been produc-

■ The owners of an undivided interest in a mineral estate are tenants in common. While each of the cotenants may explore for oil and gas on property owned in common without the consent of the other co-owners, none can do so to the exclusion of the other cotenants.[15] When oil or gas is discovered, the producing cotenants must account to the nonproducing cotenants for the pro rata share of the latter in any net profits derived from the mineral exploration.[16]

■ The owners argue that the cotenants' answers afford no basis for concluding that the cotenants had ratified the lease. This contention is without merit. A technical ratification by a cotenant is not required to prevent a trespass. Mere acquiescence in the existence of a lease and the acceptance of royalties from a lessee, after the expiration of the primary term, can estop a lessor from denying lessee's title.[17] The conduct of a lessor also can operate as a waiver of objection to an earlier event.[18] Measured by these standards and by the fact that the two cotenants here did not seek relief in this suit, the answers of the cotenants clearly demonstrate error of law in the trial court's conclusion that the lessees had trespassed when they entered upon the land and commenced drilling the Mullins well. We therefore hold that, even though the effective date of the despacing order was postponed by a facially void ex parte correction order, the lessees' entry lacked the attributes of trespass.

■ Because lessees were not trespassers, it is unnecessary to determine whether their conduct in the various Commission proceedings may have been in bad faith.[19] Since the well had been drilled with the implied consent of two of the cotenants, the lessees were required to account to the nonconsenting cotenants for only the *net profits* derived from production. The district court hence erred in awarding gross

---

ing on the land in contention; (3) stated that the lease was still in force and effect to the best of her knowledge; and, (4) stated that she had been receiving royalties from the well.

(b) Ruth Mullins Seger answered that (1) Ward had entered upon her property with her knowledge and he had paid her surface damages; (2) to the best of her knowledge and belief the well had been producing since it was drilled and is still in force and effect; and, (3) further, she had also been receiving royalties from the well.

15. *Earp v. Mid-Continent Petroleum Corporation,* 167 Okl. 86, 27 P.2d 855, 858 [1933]; *Mershon v. Essley,* 204 Okl. 660, 233 P.2d 293, 297 [1951]; *Harper v. Ford,* Okl., 317 P.2d 210, 214–215 [1957]; *Dilworth v. Fortier,* Okl., 405 P.2d 38, 49 [1965] and *De Mik v. Cargill,* Okl., 485 P.2d 229, 233 [1971].

In *Earp, supra,* the court held that a tenant in common may properly lease, for oil-and-gas purposes, his interest in the property without the consent of his cotenant, and that the lessee, upon execution and delivery of the lease, becomes a tenant in common with the tenants in common of his lessor, and, upon production, is liable to account to the nonconsenting cotenant on the same basis as his lessor would have been compelled to account had production been accomplished by him. See also *Harper v. Ford, supra* at 214–215.

16. When oil or gas is discovered by one cotenant, he may deduct the necessary expenses of developing, extracting and marketing; but an accounting must be made to the other cotenants for their pro rata share of the production. *Earp v. Mid-Continent Petroleum Corporation, supra* note 15 at 858; *Essley v. Mershon,* Okl., 262 P.2d 417, 420 [1953] and *Dilworth v. Fortier, supra* note 15 at 49. See also, Reynolds, Co-ownership of Property in Oklahoma, 27 Okl.Law.Rev. 585, 605 [1974].

17. *Gibson & Jennings, Inc. v. Amos Drilling Co.,* 196 Okl. 143, 162 P.2d 1002, 1006 [1945] and *Durkee v. Hazan,* Okl., 452 P.2d 803, 812–813 [1969].

18. *Durkee v. Hazan, supra* note 17 at 812–813 and *Earp v. Mid-Continent Petroleum Corporation, supra* note 15 at 864.

19. The owners cite 1 Kuntz, Law of Oil and Gas, § 5.6 at p. 115 [1962] for the proposition that a producing cotenant will not be allowed to deduct drilling costs if he drills in bad faith. We note that the only case cited in § 5.6, *New Domain Oil and Gas Co. v. McKinney,* 188 Ky. 183, 221 S.W. 245, 251 [1920] supports the opposite conclusion. There, the court stated that the rule of disallowing deduction of expenses to a willful trespasser should not apply in the case of cotenants. Our case law similarly makes the producing cotenant accountable to the nonconsenting or nonproducing cotenant only for his pro rata share of the *net* profits. See *Dilworth v. Fortier, supra* note 15 at 47–49 and *Earp v. Mid-Continent Petroleum Corporation, supra* note 15 at 858.

profits to the owners. Instead, it should have allowed the drilling and operating costs to be deducted.[20]

 Because it is readily apparent from the face of the pleadings that the lessees had not trespassed on the owners' land, the gravamen of owners' claim was their plea (a) to secure an accounting of the net profits derived from the mineral extraction and (b) to cancel an oil-and-gas lease. The relief sought called for an exercise of equitable cognizance.[21] Inasmuch as punitive damages are not available in a chancery suit, the owners' plea for that kind of award was properly denied.[22] Moreover, when a case is submitted, as here, upon a stipulation which dispenses with the fact issues, trial by jury may be deemed to have been waived.[23]

 Still to be resolved is how, and to what extent, the lessees' right to protect the lease by production from the land threatened with despacing, exercised by drilling begun *before* despacing was established by the Commission's retroactive order, was affected by (a) the Court of Appeals' invalidation of the Commission's *regulatory* order and (b) the agency's establishment of despacing *via* its retroactive order. This dispositive issue remains unexplored by the trial court's decree under review.[24] It was not raised by the parties who erroneously assumed it had been resolved by the "settled law of the case" doctrine. Whether a backdated despacing order is invocable as a basis for destroying a lessee's opportunity to protect its property by drilling is a public-law issue which we are at liberty to raise *sua sponte*.[25]

## III

## CANCELLATION–OF–LEASE ISSUES

Both the district court and the parties below mistakenly assumed in this *private-law proceeding* that the retroactive date of the *regulatory despacing order* was conclusive on the cancellation-of-lease controversy and that the trial court's adjudication of the correction order's facial invalidity was essential to the declaration that the lease had terminated for lack of production at the end of its primary term. By focusing solely on the impact these regulatory orders had upon the continued vitality of the lease, the trial court overlooked that, while despacing process was in progress, the lessee was *statutorily prohibited* from

---

**20.** The lessees urge that the owners should be equitably estopped from claiming that the lease had expired. Our disposition of the case makes it unnecessary to reach this argument.

**21.** For the equitable character of accounting suits, see *Mills v. Mills,* Okl., 512 P.2d 143, 150 [1973]; *Finley v. Concho Construction Company,* Okl., 388 P.2d 863, 866 [1963] and *Clark v. Addison,* Okl., 311 P.2d 256 [1957](syllabus 2). For the equitable character of suits to cancel instruments, see *Coal Oil and Gas Company v. Styron,* Okl., 303 P.2d 965, 968 [1956]; *Hackett v. Hackett,* Okl., 429 P.2d 753, 755 [1967] and *Seabolt v. Ogilvie,* Okl., 448 P.2d 1009, 1011 [1969].

**22.** Exemplary damages are allowed only where fraud, oppression, gross negligence or malice, actual or presumed, is present. A person may commit such willful acts in reckless disregard of another's rights that malice may be inferred. 23 O.S.1981 § 9; *Slocum v. Phillips Petroleum Co.,* Okl., 678 P.2d 716, 719 [1984]; *Dilworth v. Fortier, supra* note 15 at 45 and *Oden v. Russell,* 207 Okl. 570, 251 P.2d 184, 187 [1952]. Punitive damages may not be awarded in a suit of eq-

uitable cognizance. *Mid-Continent Petroleum Corporation v. Bettis,* 180 Okl. 193, 69 P.2d 346, 348 [1937]; *Smith v. Owens,* Okl., 397 P.2d 673, 681 [1965] and *Sinclair Oil & Gas Company v. Bishop,* Okl., 441 P.2d 436, 448 [1968].

**23.** *Citizens-First National Bank of Independence, Kan. v. Whiting,* 112 Okl. 221, 240 Pac. 641 [1925].

**24.** This cause was submitted in the district court on stipulation of facts. When a cause is submitted upon an agreed statement of facts, it is the duty of the appellate court to apply the law to such facts as a court of first instance and to direct judgment accordingly. *Landy v. First National Bank & Trust Co. of Tulsa,* Okl., 368 P.2d 987, 989 [1962]; *Odom v. Turner,* 204 Okl. 370, 230 P.2d 487, 489 [1951] and *McAfee v. State,* 116 Okl. 30, 243 P. 721 [1926].

**25.** Where public-law issues are involved, this court may, on review, consider them upon theories not presented below. *Special Indemnity Fund v. Reynolds,* 199 Okl. 570, 188 P.2d 841, 842 [1948] and *McCracken v. City of Lawton,* Okl., 648 P.2d 18, 21 [1982].

drilling in the area sought to be affected by the spacing application.[26]

■ Since the lessees' ability to protect their leasehold interest *was statutorily impaired,* they were entitled in equity to a reasonable time—after the impediment had been removed—to commence drilling operations.[27] The *reasonable time period* within which to drill *could not* commence at a point *anterior to* the Commission's promulgation of its despacing order—i.e., *before* the legal obstacle to drilling activity came to be removed. Here, the lessees, because of authority granted them by the emergency order, sought and did begin to drill in advance of this time. As explained earlier, their presence on the land after the emergency order's invalidation could not be deemed a trespass. The lessees also complied with the necessary regulatory requirements by procuring a location exception order which was made retroactive to April 27, 1977. That order remains in full force and effect. In short, *the Mullins well does stand as an authorized well in the unit.* Because of these factors, the retroactivity of the despacing order cannot operate to deprive the lessees of their vested property rights in the lease.[28] It was the filing of the despacing application—an act of the owners—that raised the statutory barrier which rendered impossible the lessees' performance of their contractual obligations under the lease. Since it was the owners' action that prevented performance from being rendered at the time it was due under the terms of the lease, the owners may not take advantage of the lessees' failure to drill timely.[29]

The trial court's decree is reversed with directions to render judgment for the lessees on the owners' claim for cancellation and to proceed with an equitable accounting in a manner not inconsistent with this pronouncement.

DOOLIN, V.C.J., and HODGES, LAVENDER, HARGRAVE, KAUGER and SUMMERS, JJ., concur.

ALMA WILSON, J., concurs in part and dissents in part.

The temporary cessation of production under an oil-and-gas lease will not result in the termination of the lease. *State ex rel. Commissioners of Land Office of Said State v. Amoco Production Co.,* Okl., 645 P.2d 468, 471 [1982]. Under the common-law doctrine of temporary cessation, *a reasonable time* is allowed for resumption of drilling operations. *Hoyt v. Continental Oil Co.,* Okl., 606 P.2d 560, 563 [1980].

**26.** The terms of 52 O.S.1971 § 87.1(d)—the statute in effect when the despacing application was before the Commission—provide in pertinent part:

"(d) ... The *drilling of any well* or wells into a common source of supply, covered by a *pending spacing application,* at a location other than that approved by a special order of the Commission authorizing the drilling of such well, *is* hereby *prohibited.* * * *" [Emphasis added.]

Subsequent amendments to § 87.1 [Okla.Sess.L. 1977, Ch. 76, § 1; Okla.Sess.L.1980, Ch. 33, § 1; Okla.Sess.L.1982, Ch. 10, § 1 and Okla.Sess.L. 1984, Ch.58, § 1] did not affect the quoted language.

See in this connection our discussion in *Union Oil Co. of California v. Brown,* Okl., 641 P.2d 1106, 1109–1110 [1982].

**27.** In analogous situations lessees have been granted a *reasonable time* to resume operations after their lease was legally challenged as having expired and then upheld as valid even though the primary term came to an end during the legal proceedings. *Jones v. Moore,* Okl., 338 P.2d 872, 875–876 [1959]. Such a result is clearly equitable and is based on the premise that the lessor's challenge to the lease interrupted the lessee's operations that would have otherwise held the lease.

**28.** Oklahoma jurisprudence has long recognized that an oil-and-gas lease conveys to the lessee a present, vested interest in the land. *Rich v. Doneghey,* 71 Okl. 204, 177 Pac. 86, 89 [1918] and *Wickham v. Gulf Oil Corp.,* Okl., 623 P.2d 613, 616 [1981].

**29.** In *Chilton v. Oklahoma Tire & Supply Co.,* 180 Okl. 39, 67 P.2d 27, 29 [1937], the court, quoting from *Empson Packing Co. v. Clawson,* 43 Colo. 188, 95 Pac. 546, 549 [1908], expressed the pertinent rule of law in these terms:

"'He who prevents a thing from being done may not avail himself of the nonperformance which he has himself occasioned; or, if the performance of an obligation is prevented by one of the parties to a contract, the party thus prevented from discharging his part of such obligation is to be treated as though he had performed it.'"