**21ST CENTURY INVESTMENT COMPANY, Appellee,**

v.

**Edna Maye PINE, Kellie Pine Harlan, and GMG Oil & Gas Corp., Appellants.**

**No. 64221.**

Court of Appeals of Oklahoma, Tulsa Divisions.

Oct. 14, 1986.

Rehearing Denied Dec. 8, 1986.

Certiorari Denied March 3, 1987.

Richard A. Paschal, Hall, Estill, Hardwick, Gable, Collingsworth & Nelson, Inc., Tulsa, for appellee.

Richard K. Books, Patricia A. Watts, Watson & McKenzie, B. Don Barnes, Stack & Barnes, P.C., Oklahoma City, for appellant GMG Oil & Gas Corp.

BRIGHTMIRE, Presiding Judge.

A lust for liquid gold located in a proven reserve appears to have motivated defendant's attempt to lease a tract out from under an existing oil and gas lessee. The decisive issue upon which the case turns is whether the first lessee's lease subsisted at the time the defendant took a second lease. The trial court concluded it did and granted plaintiff most of the relief it requested. Defendant appeals. We affirm.

### I

The operative facts are largely undisputed. The action was brought November 19, 1984, by 21st Century Investment Co. against Edna Pine, Kellie Pine Harlan and GMG Oil & Gas Corp., seeking the following relief: (1) injunctive—enjoin GMG and the lessors (Pines) from interfering with its leasehold interests; (2) quieting title to its lease; and (3) $25,000 compensatory and $50,000 punitive damages for slandering Century's title.

Edna Pine and her kindred had for years owned many acres of minerals in Okmulgee County, Oklahoma. During this time the Pines set basic business policy but left the day-to-day operation and management of their rather extensive enterprise in the hands of longtime employee Betty Reamer. For several years plaintiff, 21st Century—an oil and gas production company—dealt with her in leasing Pine properties—usually through Billy Martin, a local lawyer—and the business relationship between them had been good.

On October 5, 1982, Century acquired several 40-acre leases from the Pines.[1] Of interest in this case are five adjoining tracts named Pine # 9, # 9A, # 9B, # 10 and # 11. All five leases bore an expiration date of October 5, 1984, and each was subject to a provision extending the primary term if lessee was engaged in drilling operations.[2] The Pines also owned the surface of Pine # 9 and # 10, and a man named Morris owned the surface of tracts # 9A, # 9B and # 11, as shown on the following map:

---

1. It was a policy of the Pines not to lease more than 40 acres in a single lease in order to foster full development of their properties by preventing a single producing well from holding large tracts.

2. The extension clause reads as follows:
 "If at the expiration of the primary term oil or gas is not being produced on said land, or on acreage pooled therewith, *but the lessee is then engaged in drilling* or reworking *operations thereon,* this *lease shall remain in effect* so long as operations are prosecuted, either on the same well or any other well thereafter commenced, with no cessation of more than thirty (30) days, and if they result in the production of oil or gas, this lease shall remain in effect so long thereafter as such production continues. (Emphasis added.)"

Plaintiff contracted with Spencer Drilling Company to drill on subject tracts. Wells were drilled on Pine #9 and #10 in August and September, 1984. On August 31, 1984, Century filed with the Corporation Commission notices of intent to drill on

tracts #9A, #9B and #11. On September 6, 1984, the Commission approved wells on each of the tracts and designated the locations.

Because Century had had unpleasant experiences with surface owner Morris during the preceding two years—once having had its agent driven from his property at gunpoint and on two occasions being faced with threats by a bitter Morris to shoot holes in an expensive gas compressor—plaintiff contacted Morris in the middle of August, 1984, to negotiate settlement of his surface damage claims with regard to drilling the planned wells on tracts #9A, #9B and #11. It was not until the middle of September, however, that the parties' attorneys worked out a settlement of all Morris' claims and received his commitment he would not interfere with Century's entry onto the three tracts. Sometime thereafter, but before October 5, plaintiff surveyed and staked Pine #9A and notified Morris that heavy equipment would be moving onto his property.

In the meantime, while the Morris negotiation was going on, attorney Martin kept in touch with Reamer informing her of the difficulties being encountered in reaching a surface damage settlement with Morris. Reamer said she understood the situation and shortly before October 5 told Martin he had "no problem" and that the Pines "will work with you" in resolving the problems so Century could drill the leases. This assurance, assessed as a positive protective commitment in light of past dealings, caused plaintiff to believe the primary term of the lease would not be strictly enforced or, in any event, that plaintiff would be offered a renewal of the lease as the Pines had done in the past. Nevertheless, Century also took the prudent precaution of doing what it could to commence drilling operations just to be on the safe side.

The important circumstance that looms as the catalyst of this controversy is the result achieved by the well Century drilled on Pine #9 just 165 feet north of #9A's northern boundary. As of October 5 only Century was aware that the #9 well was likely to be a prolific oil producer. As a result of this closely guarded development plaintiff not only took steps to commence drilling operations on #9A but went about the immediate area acquiring whatever additional leases it could.[3]

It was under these circumstances that plaintiff moved a bulldozer onto #9A to prepare it, along with #9B and #11, for entry of Spencer's heavy drilling equipment. The bulldozer first moved onto #9A on the morning of October 5. During the afternoon, the settlement agreement reached two weeks earlier notwithstanding, Morris appeared on the tract sporting a pistol strapped to his side. He approached the operator and ordered him to leave the bulldozer, get off the premises, and stay off of all of Morris' properties. Because of Morris' armed aggression Spencer was advised by plaintiff not to proceed further with the #9A drilling operation on that date. Save for Morris' threats of violence, armed impoundment of drill site preparation equipment, and ejectment of its operator, Spencer had planned to have pits dug, a water pump set up and otherwise finish preparing the site for installation of a drilling rig by midnight Friday, October 5, 1984.

The following Monday, October 8, plaintiff called Morris' lawyer to protest violation of the settlement agreement. The lawyer acknowledged the agreement but said Morris nevertheless had decided not to allow Century onto his property without a court order. So, plaintiff prepared for a lawsuit and on October 19, 1984, filed an action to enjoin Morris from interfering with its drilling activities on #9A.[4]

Although plaintiff obtained an ex parte temporary restraining order forbidding Morris from interfering with plaintiff's

---

**3.** It was able to get some 600 more acres at a cost of around $30,000.

**4.** In preparing for the lawsuit 21st Century discovered that, through no fault on its part, two letters of credit it was required to have by the Surface Damages Act and the rules of the Corporation Commission had expired due to error on the part of plaintiff's bank. The matter was promptly corrected.

drilling operations, Morris' lawyer advised plaintiff's lawyer that he was unable to make Morris understand the law—that is, the significance of the court order—and therefore it was decided not to place men and equipment at risk until a hearing on a permanent injunction could be held. Such hearing was set for November 2, 1984, and on November 19 the court entered an agreed order settling the dispute. Further drilling operations were then set to proceed November 21.

It is significant that in the meantime, on November 5, 1984, one Linda Clark called Reamer on behalf of Domestic Energy Company and asked if # 9A was available for leasing. Reamer advised Clark that Century had run into problems and she was giving it a reasonable length of time to get them solved and complete the drilling of a # 9A well.

Enters GMG.

Information concerning the extraordinary oil production of Pine # 9 became public during the first week of November. On November 13, an attorney for GMG, who had heard about the Pine # 9 well, called Reamer for the purpose of obtaining a lease on the Pine # 9A tract. He offered to pay a bonus of $250 an acre—five times the $50–an-acre bonus that was the going price in the area—and offered to provide the Pines with a written indemnification against any claims which might be made by Century as a result of giving GMG a lease.

During the next few days GMG officials negotiated not only with the Pines but with surface owner Morris who GMG agreed to pay an amount substantially higher than what Morris had agreed to accept from Century. Finally, on Friday, November 16, the Pines, without any notice to Century, executed a lease on # 9A to GMG and in turn received the large bonus and the promised indemnity agreement. Later that day GMG filed the lease of record and delivered a letter to Century's local lawyer in which GMG advised of the GMG lease, contended it was superior to the 21st Century lease, demanded a release of the Century lease, and threatened immediate litigation in the event such a release was not forthcoming.

Plaintiff did not, of course, release its lease but instead sent a bulldozer out to tract # 9A the next day to continue with its drilling operations. Its activity was interrupted by an officer of GMG who displayed the GMG lease and represented to the bulldozer operator that Century had no lease. The operator left and went to # 9B.

 The case was tried January 14, 1985. The trial judge prepared an excellent written analysis of the evidence. In it he found that the facts and equities were supportive of Century's position, and concluded that it possessed a valid and subsisting lease and that it was entitled to have its Pine # 9A leasehold title quieted in it. The court then directed counsel for plaintiff to prepare an appropriate journal entry of the judgment showing a rendition date of January 29, 1985. Counsel did so and the instrument was filed February 22, 1985.[5]

---

5. There is a question whether the judgment is a final appealable one. The last paragraph of the adjudicatory portion of the decree reads:

"6. This Judgment disposes of all issues in this case except for plaintiff's claim for damages. A hearing on that claim … will be set on application of any one of the parties."

Also pending was a GMG cross-claim to quiet title in it and award damages for an unstated amount, presumably against plaintiff.

GMG timely filed a motion for a new trial in which nothing was said about the damages issue or its cross-claim. This motion was the subject of a further extended hearing and was overruled as stated in another thorough, lucid, explicit and well-reasoned order prepared by the trial judge disposing of the issues raised in GMG's motion.

In view of the foregoing, and in the interest of judicial economy, not to mention the litigants' loss of time and expense, we will proceed to decide the case. The fact that neither party requested the damage issue be tried and the fact that defendant appealed, briefed and orally argued the case without ever complaining of or even mentioning the existence of the undisposed damage issue, justifies an inference, we think, that the parties have treated the claim for relief as having been abandoned by plaintiff with the approval of defendant who initiated this appeal without requesting a disposition of the damage issue. The same is also true of GMG's cross-claim. Not only does the claim appear to have been abandoned by GMG but its vague prayer for damages is based on allegations which can be considered as too indefinite to state a claim.

GMG appeals assailing the decree primarily on the ground that it was reversible error for the trial court to find and hold that the Century lease did not expire at the end of its primary term, October 5, 1984.

## II

Spearheading GMG's attack is its interpretation of the extension clause in Century's lease—one that differs from that of the trial court.

The argument is that the habendum clause of plaintiff's lease clearly and unambiguously provides that the lease will expire on October 5, 1984, if there is no production. And in the absence of production, the only other thing in the lease that can extend the term is the extension clause, the invocation of which, said GMG, requires that the lessee be " 'then engaged in *drilling* or *reworking*' and not that the lessee merely 'commence operations.' " [6] And so, continues GMG, since the evidence is undisputed that Century "was not 'engaged in drilling' on October 5, 1984," GMG should have won the lawsuit in the trial court. In other words GMG insists that the lessee must be "engaged in drilling" in a literal sense of a bit boring a hole before the extension obtains.

One trouble with this analysis of the extension clause is that it ignores a material modifier of the word "drilling," namely, the word "operations." The crucial phrase is unambiguously structured grammatically to read in pertinent part thus: "If at the expiration of the primary term ... lessee is then engaged in *drilling* ... *operations* ... this lease shall remain in effect so long as *operations* are prosecuted...." [7] The issue arising from this language, then, is not whether Century had actually spudded in on Pine # 9A but whether it had begun drilling operations within the contemplation of subject clause.

Parenthetically, as suggested by the posited question, defendant's theory calls for placing a construction on the word "drilling" more narrow than that adopted by the supreme court of this state as well as most other courts across the nation.[8]

Before dealing with the dispositive issue mentioned above we will comment on some adjunctive arguments GMG weaves into its presentation. It says, for instance, that the clause in Century's lease should be construed differently from leases which provide for the extension of the primary term by the lessee "merely 'commencing operations' ", and adds that in this case the trial court construed the Century lease as though it contained the latter provision and the effect of doing so was to reform the Century lease. We disagree. The trial court did not decide the issues on some basis other than the terms of Century's lease. On the contrary the trial court properly rested its decision on evidence, which under the law, as we shall see, supported its finding that Century engaged in drilling operations on # 9A before midnight of October 5, 1984.

Another of GMG's concession-and-avoidance contentions is that even if one considers the Century lease as providing for extension in the event lessee is found to be engaged in drilling operations on the last day of the term, the court was still wrong in that there was no "commencement of operations" as determined by the criteria mentioned by E. Kuntz in his work, "A Treatise on the Law of Oil and Gas." [9]

■ We have examined this reference and find that Professor Kuntz's understanding of the law does not differ from that of the trial court or ours. For example, as a result of reviewing cases across the nation including some from Oklahoma, the professor composed the following pertinent legal synthesis:

"[I]f the lessee ceases his preliminary operations without penetrating the surface or without completing the drilling

---

**6.** Emphasis is GMG's.

**7.** See footnote 2 for full text of clause. Emphasis supplied.

**8.** *See Jones v. Moore,* 338 P.2d 872 (Okl.1959); 3 E. Kuntz, *A Treatise on the Law of Oil and Gas* § 32.3 (1967).

**9.** GMG refers us to 3 E. Kuntz, *A Treatise on the Law of Oil and Gas* § 32.3 (1967).

operation, then it is necessary to consider what his objective was in starting the preparatory activity. In this instance, it is necessary to inquire into the diligence in continuing the operation and his good faith in order to determine whether or not his physical conduct constituted the commencement of a well. If he had no intention of completing a well, the preliminary work was not the commencement of a well as the final product; it would be the commencement of work toward an objective other than the drilling of a well.

Recognizing that the described factors are all elements of the same ultimate fact finding, it is possible to state a general test for the determination of whether or not a well has been commenced. A lessee has commenced a well if he has conducted operations on the land in good faith preparation for the drilling of a well for oil or gas and has continued the operation in good faith and with due diligence...." [10]

And, adds the author, "it is generally held that acts which are preparatory to drilling are sufficient to constitute the commencement of a well and that it is not essential that the lessee be in the process of making hole." [11]

Not only does the foregoing support the conclusion that "drilling operations" were timely commenced by Century in this case but it is consistent with the decisional law of this state. Our high court dealt with a commencement clause even more drill oriented than the one in question in *Jones v. Moore*, 338 P.2d 872 (Okl.1959). In *Jones* the lease provided for an extension of the primary term, "[i]f the lessee shall commence to drill a well within the term...." Though the factual situation differed from those in sub judice case, the circumstances in *Jones* of interest to us here are these. To extend the lease it was necessary for lessee to commence to drill a No. 2 well on or before midnight of September 6, 1956. The evidence was that the lessee "staked a location for well No. 2, and had a slush pit

dug preparatory to drilling, and had ordered a machine out of Kansas to drill the well" on September 6. The machine was on its way a few days later but had to be stopped because lessee was served with a temporary injunction on September 12, 1956, in an action filed by the lessor. Operations were resumed in the latter part of October, 1956, and actual drilling started December 2, 1956. In upholding the trial court's finding that the lessee had proceeded with diligence prior to the lessor's interference and its conclusion that lessee's lease was valid and subsisting, the supreme court said lessee had a right under the commence-to-drill clause to "commence well No. 2, even on the last day of the term...." And if "well No. 2 was commenced in good faith on September 6, 1956, then [lessees] were entitled to complete such well provided they used reasonable diligence in the drilling thereof." More pertinent to our problem here is what the court said about the sufficiency of the evidence. It was sufficient, said the court, to show the lessees had commenced to drill on September 6, 1956, "and were proceeding with reasonable diligence the drilling operations until enjoined in [sic] September 12, 1956," from proceeding by court order.

We hold that the clear weight of the evidence supports the trial court's finding that Century was engaged in drilling operations on October 5, 1984.

### III

GMG's last shot is also aimed at destroying the trial court's finding of an extended term. It is related to its earlier argument and is likewise in the nature of an "even if" or concession-and-avoidance argument. Summarized, it is to the effect that if one concedes that Century was engaged in drilling operations on October 5, 1984, it still cannot prevail because it ceased operations for more than 30 days thereafter so that the lease expired in any event at midnight November 4, 1984.

GMG's underlying rationale is basically this: First of all, Century's lease does not

---

**10.** *Id.* at page 69.

**11.** *Id.* at page 70.

contain a force majeure clause as is found in some leases—a clause that excuses lessee from performing if prevented from doing so by any circumstance or condition beyond its control. And secondly, the doctrine of obstruction is not available to lessee for two reasons: (1) it applies only where the lessor obstructs the lessee; and (2) even if it be conceded that it applies where a surface owner prevents drilling operations, as Morris did, it cannot be applied here because Century failed to comply with the Oklahoma Surface Damages Act [12] before entering Morris' land.

With respect to the first point GMG maintains that the trial court's reliance on an earlier decision of this court was misplaced because under the rules of the supreme court it has no "precedential value." The case referred to is *Burger v. Wood*, 575 P.2d 977 (Okl.App.1978), and in it we held that where oil and gas lessee attempted to exercise his right to enter leased land to commence a well and was barred from doing so by surface owner's threats of bodily harm, such obstruction extended the term of the lease.

Not only should the trial court have ignored this judicial precedent, says GMG, but instead it should have invoked the thoughts and ideology of Professor Kuntz on the subject as reflected in what GMG calls his condemnation of *Burger* in an Oil and Gas Reporter discussion note.[13] According to GMG's quote from the note Kuntz expressed the following view concerning *Burger*:

" 'The plight of a lessee who uses judicial process and still is not able to enforce his right to enter to drill before the end of the primary term because of obstruction by the surface owner does stimulate sympathy, *but it provides no theoretical basis for preventing the termination of a lease.* When the lessor obstructs the lessee's operations, the theoretical basis employed is that the lessor is denied the

right to assert that the lease has terminated because of the general doctrine of estoppel or the broad equitable principle that he who seeks equity must do equity. *In the principal case it is difficult to identify the principle used to hold that the lease did not terminate upon expiration of the primary term.' "* (Emphasis is GMG's.) [14]

And during oral argument before this court, GMG offered the supreme court's recent opinion in *French v. Tenneco Oil Co.*, 725 P.2d 275, 57 O.B.J. 1205 (Okl. 1986), as decisional confirmation of Kuntz's concern about *Burger*.

First, we will dispose of the *French*-based conclusion by pointing out the controversy in that case involved the interpretation and application of a temporary cessation clause in response to the issue of whether drilling of a second well was timely commenced after the first well stopped producing. Among others, an argument was advanced that, under the doctrine of obstruction, the lessee had a right to suspend operations "pending determination of a communicated assertion [from a lessor] that the lease is no longer valid and subsisting . . . ." The court indicated that lessee had such a right if lessor's attack on lessee's title comes before the temporary cessation period expires which, the court found, had not occurred. In other words the court acknowledged the doctrine of obstruction but found that it was not available to the lessees in light of the undisputed facts. The *French* court said nothing about the unavailability of relief to a lessee who is prevented from exercising his contractual rights by someone or some force other than lessor.

Turning now to GMG's Kuntz-based argument, we make these preliminary observations. We have found no case of any appellate court of this state holding that the doctrine of obstruction cannot be applied where a surface owner prevents a

---

12. 52 O.S.Supp.1982 §§ 318.2–318.9.

13. 59 O & G Rep. 503, 507 (1978).

14. This lack of "theoretical basis" concept became the major premise for a critical student note in the Oklahoma Law Review. *See* Note, *Oil and Gas: Burger v. Wood—A Misguided Application of the Doctrine of Obstruction to Third Parties,* 34 Okl.L.Rev. 162 (1981).

lessee from exercising his contractual right to drill. Professor Kuntz, so far as we can find, has never come right out and sponsored such an idea either. Nor do we agree with GMG that his observation regarding *Burger* is a condemnation. Criticism of its legal foundation perhaps, but not a condemnation of the result. And his criticism is that "it is difficult to identify the principle used to hold that the lease did not terminate upon expiration of the primary term." Assuming this criticism of *Burger* is justified we will undertake to supply the missing link and identify not merely a theoretical but more importantly, a legal basis for *Burger* as well as our conclusion in this case.

It goes without saying, of course, that a lease is a contract and because it is, we turn first of all to our statutory law for direction. There are two statutes particularly relevant to our problem. One is 15 O.S.1981 § 171 which reads:

"Stipulations which are necessary to make a contract reasonable or conformable to usage, are implied in respect to matters concerning which the contract manifests no contrary intention."

And the other is 15 O.S.1981 § 172 promulgating a kindred principle:

"All things that in law or usage are considered as incidental to a contract, or as necessary to carry it into effect, are implied therefrom, unless some of them are expressly mentioned therein when all other things of the same class are deemed to be excluded."

■ These common sense principles form a basis for a mineral owner's implied right of ingress and egress to explore for and recover his minerals. And when a mineral owner executes an oil and gas lease the lessee obviously acquires the lessor's right of ingress and egress by implication.[15] The granting clause of the lease in question, for instance, states that the Pines "grant, demise, lease and let unto the said lessee for the sole and only purpose of exploring by geophysical and other methods, mining and operating for oil and gas,

and of laying of pipe lines" etc., on a certain tract of land located in Okmulgee County. There is, it can be seen, no express provision bestowing lessor's right of surface entry on the lessee, but it cannot be doubted that such right is a necessary stipulation contemplated by § 171 and an incidental term essential to carrying the lease into effect implied under the provisions of § 172.

Appurtenant to this right of entry, of course, is the reality that the lessee must be able to exercise such right or else the lease agreement cannot be carried into effect. And if an attempted effort to gain entry and use is prevented by a temporary or remediable cause, as is the situation here and as it was in *Burger*, then the law will imply an extension of the primary term for a reasonable period of time.

So to recapitulate, we hold that under these statutory provisions, a stipulation in the lease will be implied that vests in lessee the lessor's surface entry and use rights— rights which the law will protect and enforce. And if during the term of the lease the exercise of such right is temporarily prevented either by the lessor, the surface owner, or some force majeure, the law will imply that the lease provides for an extension of the primary term of the lease for such time as is reasonably required to restore to the lessee the ability to exercise his right of entry and use. Of course, a reasonable time contemplates, among other things, the diligent and good faith effort on the part of the stymied lessee to overcome the obstruction.

IV

GMG's last proposition is that the trial court's finding and conclusion to the effect "that the statement of the lessors' agent estopped [them] from declaring the lease forfeited" is against the weight of the evidence and is contrary to law.

Because of what we have held with regard to GMG's other contentions it is unnecessary to consider this one. We will

---

15. *Mullins v. Ward,* 712 P.2d 55 (Okl.1985); *Rich v. Doneghey,* 71 Okl. 204, 177 P. 86 (1918). These cases also hold that a lessee acquires a "present vested interest" in the land.

say, however, that in our opinion the undisputed evidence recited earlier in this opinion adequately demonstrates that the court reached a just and correct conclusion in this regard.

### V

The trial court's order overruling GMG's motion for a new trial and its decree are both affirmed.

REIF and STUBBLEFIELD, JJ., concur.